UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

US DISTRICT & BANKRUPTCY
COURTS

2019 OCT 16 PM 9: 12

RECEIVED

| | |
|---|---|
| Mehdi Moini<br>732 Ridge Dr<br>McLean, VA 22101<br>512-736-8650<br>　　　　　　Plaintiff,<br><br>VS.<br><br>Thomas J. LeBlanc<br>In his Official Capacity as President<br>George Washington University<br> 1918 F St NW, Washington, DC 20052<br>202-994-6500<br>　　　　　　Defendant | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ |

Case: 1:19−cv−03126
Assigned To : McFadden, Trevor N.
Assign. Date : 10/16/2019
Description: Employ. Disc. (H−DECK)

**I**
**COMPLAINT**

1. **Discrimination in Employment.** There is a toxic atmosphere of racism and bias at the George Washington University (GWU, the University) that negatively affects the employment and life of many minorities at this institution.  In 2018, the University President and Provost warned the GWU community that this climate of racism on campus leads students, staff and faculty of minority to feel unwelcome and that some contemplating leaving the University. Ex. 1. Prof Moini, an Iranian national and a former Associate Prof of Forensic Chemistry at the Department of Forensic Sciences (the Department) in the Columbian College of Art and Sciences (CCAS) was at the receiving end of this racism.   With an excellent record of scholarship, teaching, and service in his discipline along with unanimous recommendation of his Department Personnel Committee as well as favorable external peer reviews of his teaching, his tenure and promotion to full Prof was ostensibly denied by the University reviewing entities because of the student evaluations in his one-credit Graduate Seminar course. Ex. 2-4. This is

1

when at the same time the CCAS Dean and the Provost promoted his Caucasian co-instructor to the Department Chair, even though he had taught the Graduate Seminar before Prof Moini and later with him and had received similarly poor student evaluations. Ex. 4, 5. It became apparent that the University real motive was to get rid of Prof Moini just to keep the predominantly Caucasian students at the Department happy.  The racism of the University policy has resulted in a department with no diversity in which 100% of its current full time faculty members are Caucasian men. Ex. 6. These are relevant evidences and show that the university's stated reason for the denial of Prof Moini's tenure was a pretext. Minority Employees at NASA (MEAN) v. Beggs , 723 F.2d 958, 962 (D.C. Cir. 1983), citing McDonnell Douglas , 411 U.S. at 804–05, 93 S.Ct. 1817.

 2. **Arbitrary and Capricious Action.** Prof Moini also claims that even if we take the administration stated reason at face value, denial of tenure and promotion of an exceptional faculty based on student evaluations in a one-credit seminar course is arbitrary and capricious and against the GWU Faculty Code (FC). Ex. 7. The University Dispute Resolution Committee Appeals Panel (Appeals Panel) already confirmed this claim. Ex. 7. The Appeals Panel of the University Dispute resolution Committee (Appeals Panel) consisting of ten faculty members from across the University, including two professors from GWU Law School unanimously concluded: "In fact, '[a]ll members of the [hearing] panel agree that Prof Moini's scholarship is impressive.'…The record of Dr. Moini's teaching included letters from Dr. Moini's graduate students who secured good jobs upon graduation, praising Dr. Moini, along with acceptable student evaluations for Dr. Moini's other courses, and favorable peer reviews of his teaching. The one-hour Graduate Seminar in which Dr. Moini's evaluations were relatively poor, is a required course that all students must take twice, in their initial semester and their final semester.

It is a relatively new course (started in 2013) and is quite demanding, the second time requiring the completion of a thesis. The course had been co-taught until very recently and the evaluations for the other Prof in this course were similarly negative. Thus, to rely solely on the student evaluations of this one course, and disregard every other metric upon which teaching should be evaluated to deny tenure and promotion, as the reviewing entities did, is arbitrary and capricious". Ex. 8. Using student evaluation to measure teaching quality especially in a graduate program was also contradicted the Vice Dean for Faculty and Administration (Eric Arnesen) memorandum of guidance to the school's department chairs and program heads, dated 16 May 2017, in which he stated: "Student evaluations, in my view, are an imperfect tool for measuring teaching evidence and quality." Ex, 9.

3. **Breach of Contract.** The University also breached its employment contract, a) by their actions  in paragraph 1& 2 above; b) by not following the faculty performance reviews guidelines listed in FC, Faculty Handbook (FH), and the University Teaching and Leaning Guidelines that are commonly done for other faculty on tenure track, Ex. 7, 10, 11; c) by University not providing any metrics for measuring "teaching excellence" and discriminatory equating student evaluations and specifically of the one credit seminar course to "teaching excellence", Ex. 8, P 3; d) by the administration abuse of the term "compelling reason". The FC definition includes "failure by the recommending faculty to meet the burden of substantial evidence or otherwise provide adequate reasons, including insufficient support by external reviewers, to demonstrate that candidate meets, or fails to meet, the applicable standards of excellence", Ex.7, P 12; e) by the University denial of Prof Moini privileges afforded to him by the FC including "A party shall be entitled to inspect and copy, in advance of the hearing, all relevant documents in the control of the other party and not privileged and may offer such

documents or excerpts therefrom in evidence." Ex. 7, P 29; f) by the forbidden ex parte communications of the University representative (Vice provost Bracey) with Hearing panel member and not disclosing it. Ex. 7, P 29; and g) by introducing new evidences in the appeal process that were not introduced in the hearing Process. Ex. 7, P 30. In addition, these actions violate the covenant of good faith and fair dealing underlying that contract. Plaintiff also seeks relief for the damage caused by these actions.

## II

### Jurisdiction and Venue

4. This lawsuit arises under the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §§ 2-1402.11 et seq., Title VII of the Civil Rights Act of 1964, and 42 U.S.C. § 1981, to remedy Defendant's discriminatory refusal to grant tenure and promotion to Plaintiff because of his national origin, as well as Defendant's arbitrary and capricious decisions and breach of its employment contract with Plaintiff. This Court has jurisdiction under D.C. Code Ann. § 2-1403.16, and D.C. Code § 11-921(a) because the discriminatory and otherwise unlawful actions challenged in this lawsuit occurred in the District of Columbia.

## III

### Parties

5. Plaintiff, Mehdi Moini, is a Middle Eastern (Iranian) man and a resident of the state of Virginia. He was formerly employed as an Associate Prof of Forensic Chemistry for Defendant, the George Washington University.

6. Defendant, Thomas J. LeBlanc, in his Official Capacity as the President of the George Washington University. The defendant is a private institute of higher learning located in

Washington, DC. The University employees more than 500 employees, and claims that the university is an Equal Employment Opportunity/Affirmative Action (EEO/AA) employer.

## IV
## FACTUAL BACKGROUND
### A. University Tenure and Promotion Policy

7. The Department of Forensic Sciences at GWU is a two-year Masters Degree granting forensic sciences program. Currently, all full-time faculty members of the Department are male of European descent and the student body is predominantly Caucasian female. (https://forensicsciences.columbian.gwu.edu/)

8. With the help of Prof Moini, the Department is currently accredited by Forensic Science Education Programs Accreditation Commission (FEPAC).  The accreditation added a significant amount work to the student curriculum including mandatory independent research, production of a publishable manuscript, and a public presentation of the research results as conditions of graduation.  The last two requirements are met in the second one-credit Graduate Seminar course that is a required course for all Masters of Forensic Science (MFS) students. These requirements dictate the Department to accept students with adequate scientific background. Ex. 12, P 14.

9. Between 2011-2014, however, the Columbian College of Art and Sciences (CCAS) was facing a very serious deficit in grad enrollment revenue due to almost 40% drop in Forensic Science credits taken by graduate students, resulting in a CCAS warning that a further drop in enrollment will put the department at risk. Ex.13.  According to the Chair of the Department (then Prof Weedn) "Another important aspect of this period is that as CCAS pressed hard for increased enrollment, we found ourselves accepting some students that we probably should not

have-these students struggled and complained," Ex. 5, P2.[1]  The chair of the Hearing Panel (then Prof Seavey) who investigated Prof Moini's case wrote: "The CCAS associate dean for graduate studies in February 2014 notified the department that declines in enrollment put the program at risk, leading in succeeding years to the admission of students with more marginal credentials, and doubtless to some level of negativity in the teaching evaluations of Prof Rowe in the graduate research course, the course Moini would inherit not long after his arrival", Ex 4, P 2.

10. MSF students take the one-credit Graduate Seminars twice, in their initial semester and their final semester. It is a relatively new course (started in 2013) and is quite demanding, the second time requiring the completion of a publishable manuscript. Ex. 8, P 3. Originally Prof Rowe (and perhaps another Prof)[2] taught the Graduate Seminars course and then it transitioned it to Prof Moini when he joined the Department in 2014.  From fall 2014 until spring 2016 the course was co-taught by Profs Rowe and Moini.  From fall 2016, Prof Rowe, the Program Director and the new Department acting chair, assigned the course to Prof Moini as the sole instructor. Ex. 16, P 15.

11. At GWU, procedures in FC and FH are used to evaluate tenure and promotions of faculty members. Also, a document called "Teaching Portfolio Guidelines for Tenure & Promotion, What Should a Dossier Contain?" helps faculty to prepare the teaching section of their dossier for tenure and promotion. Ex. 11.

---

[1] Unless otherwise noted, the brackets inside the quotation marks are added throughout this document by the Plaintiff for clarity and are not part of the original quotes.

[2] Prof Moini requests to obtain this information as well as the student evaluations of other Prof of this course was denied by the Department and the University. Ex. 15, P 2.

12. Prof Moini's offer letter, which was a binding contract stated: "Acceptance of the appointment will constitute your acceptance of the conditions stated in the Faculty Code and Faculty Handbook and in this letter of offer.  Any subsequent change or amendments to the Faculty Code or Faculty Handbook will become a part of the contract as of the effective date of the change or amendment." Ex. 16.

13. When Prof Moini joined the GWU in January 2014, he was bound by the FC 2014 in which the criteria for tenure was: "Tenure shall be dependent upon professional competence as evidenced by teaching ability, productive scholarship, participation and leadership in professional societies, service to the University, and public service."  However, in November 2015 (the date shown on the 1st page of the FC 2015) a new FC 2015 was published in which the criteria for tenure changed to: "tenure is reserved for members of the faculty who demonstrate excellence in scholarship, teaching, and engagement in service and who show promise of continued excellence…Tenure is reserved for faculty members whose scholarly accomplishments are distinguished in their fields, and a candidate's record must compare favorably with that of candidates in similar stages in their careers at peer research universities in the candidate's field." Ex. 7, P 10.

14. According to Faculty Handbook, all regular active-status and research faculty members are required to file annual reports, in which the faculty members submit statements describing the Prof's teaching, scholarship, and service activities for the past year. The Department Chair and the Dean are charged with reviewing the Prof's annual statement and work. The review by the Department Chair and the Dean are due at the end of June and at the end of August, respectively. Ex. 10.

15. The FC also states that: "So that faculty members may assess their potential for achieving tenure, each school, and where appropriate, each department shall establish and publish written procedures to provide reviews to guide faculty members concerning progress toward tenure. Reviews do not constitute a commitment to recommend tenure. Such reviews may be satisfied by, but need not be limited to, evaluations of annual reports and mid-tenure track reviews, the results of which should be communicated to the faculty member." Ex. 7, P11 (emphasis added).

16. Prior to submission of his tenure and promotion package (September 2016), Prof Moini had filed three annual reports for academic years 2013-14, 2014-15, and 2015-16. Ex. 16-18.  He also received three annual reviews in the form of Department Head and Dean Comments on his annual reports.  Two of the Annual reports (2013-14 and 2014-15) were filed under the older FC 2014, and one of them (annual report 2015-16) were filed under the newer FC 2015. However, the Department or the CCAS did not provide any information regarding Prof Moini's progress toward tenure or promotion in any of these annual reports and he did not receive any mid-tenure review.

17. Based on the FC 2015, to apply for tenure, a faculty member submits his/her dossier for tenure and promotion to the Department Personnel Committee demonstrating his or her achievements of excellence in research, teaching and service in his discipline as well as other pertaining information such as student and peer support, student evaluations, etc. Moreover, the Department Personnel Committee will ask and obtain a minimum of five external reviews from the experts in the discipline regarding the qualifications of the applicant and if he/she has achieved excellence in scholarship, teaching and service in her/his discipline. Once the tenure

package in completed, it undergoes a five-level review: Departments, School-Wide Personnel Committees, deans, the Provost, and the President.  EX. 7, P 12.

18. The following may constitute compelling reasons for a School-Wide Personnel Committee, a dean or the Provost to independently concur or nonconcur with a faculty recommendation (see Section D.3; see Procedures for the Implementation of the Faculty Code, Section B.5):

i. Failure by the recommending faculty to meet the burden of substantial evidence or otherwise provide adequate reasons, including insufficient support by external reviewers, to demonstrate that candidate meets, or fails to meet, the applicable standards of excellence;

ii. Failure to conform to published tenure or promotion policies, procedures, and guidelines; or

iii. Arbitrary, capricious, or discriminatory action at any point in the process.

2. Deans and the Provost are also entrusted with the fiscal health of the university and must consider significant financial or programmatic constraints.

F. Nondiscrimination

Appointments, renewals, terminations, promotions, tenure, compensation, and all other terms and conditions of employment shall be made consistent with the university Policy on Equal Opportunity." EX. 7, P 12.

19. "Variant or nonconcurring recommendations from a School-Wide Personnel Committee or administrative officer [the Dean and the Provost], together with supporting reasons shall be sent to the Executive Committee of the Faculty Senate…the recommendations of the School-Wide Personnel Committee and appropriate administrative officers, accompanied by the recommendation of the department, and the report of the Executive Committee shall be transmitted to the President who will make a final decision." Ex. 7 , P 21.

20. In case of a non-concurrence, per Faculty Code the affected faculty can institute a formal grievance through the Dispute Resolution Committee. Ex. 7, P 26. "To maintain a grievance, the complaining party must allege that he or she has suffered a substantial injury resulting from violation of rights or privileges concerning academic freedom, research or other scholarly activities, tenure, promotion, reappointment, dismissal, or sabbatical or other leave, arising from: 1. Acts of discrimination prohibited by federal or local law; 2. Failure to comply with the Faculty Code, or Faculty Handbook, or other rules, regulations, and procedures established by the university; 3. Arbitrary and capricious actions on behalf of the university, or arbitrary and capricious applications of federal or local statutes and regulations; or 4. Retaliation for exercise of Code-protected rights." Ex. 7, P 18.

21. "Before instituting a formal grievance, the aggrieved party shall make all reasonable efforts to achieve a resolution of the situation through informal consultation with the appropriate faculty members and administrative officers…if efforts at mediation are unsuccessful, the aggrieved party may commence formal proceedings by means of a grievance sent to the Chair of the Dispute Resolution Committee, with copies sent to the Chair of the Executive Committee of the Faculty Senate and to the Vice President for Academic Affairs on behalf of the University." Ex. 7, P 27.

22. "On the determination that a hearing is warranted, the Hearing Officer shall promptly convene the Hearing Committee, which shall establish a schedule for the Hearing…A grievance procedure is not a formal judicial proceeding. Its purpose is to provide a fair evaluation of an allegation that a right or privilege has been violated…A party shall be entitled to inspect and copy, in advance of the hearing, all relevant documents in the control of the other party and not

privileged and may offer such documents or excerpts therefrom in evidence." Ex. 7, P 24-26,
(emphasis added).

23. "Any party may appeal the findings and recommendations of the Hearing Committee
by filing a notice of appeal with the Chair of the Dispute Resolution Committee…The parties to
an appeal shall be entitled to present written and oral argument. However, evidence not
introduced in the hearing may not be considered on appeal. The Dispute Resolution Committee
shall decide by majority vote and render an opinion in writing, sustaining, modifying, overruling,
or remanding the decision of the Hearing Committee…A Hearing Committee and the Dispute
Resolution Committee may recommend that the university action being challenged be upheld,
modified, reconsidered or remanded under specified conditions, or reversed, in whole or in
part…The decision of the relevant Committee shall be deemed final and shall be implemented by
the university unless the Vice President for Academic Affairs determines that there are
compelling reasons not to implement the relevant Committee's decision. In the event of such a
determination, the Vice President shall transmit his or her determination (including an
explanation of such compelling reasons) and recommendation, and the record of the case,
through the President of the university to the Board of Trustees, or, at the election of the
Grievant, solely to the President…for a prompt decision of the President or the Board of
Trustees." Ex. 7, P 31, (emphasis added).

### B. Prof Moini Tenure Application

24. Prof Moini, an Iranian national, obtained his Ph.D. in chemistry from Michigan State
University.  After his Ph.D., Moini spent four years at University of Florida and George
Washington University as a Post Doctoral Associate and Research Scientist respectively, and 20
years at the University of Texas at Austin and Texas State University as the Director of the Mass

Spectrometry and Proteomics Facility and Research Prof respectively.  Prof Moini then joined the Smithsonian Institution as a federal employee (Group 14, Step 4) in the role of Research Scientist and became tenured there in 2013, Ex.19; therefore Prof Moini was well qualified to be a Prof at GWU. The Hearing Panel Head wrote: Prof Moini "arrived with demonstrated eminence in his field and willingness to join a Forensic Sciences program".  Ex. 4, P 2.

 25. To answer the call for "Strengthening Forensic Science in the United States" by the National Research Council, in April 2013 Prof Moini applied for an open rank professor position at the Department. Based on Prof Moini's accomplishments, Prof Weedn (then the Department Chair) discussed hiring Prof Moini as a tenured Full Prof. Ex. 20.  The CCAS Dean (then Prof Guenther) changed that to a Full Prof Position without tenure. Ex. 21. The Provost's (then Dr Lerman) offer letter dated December 2013 offered Prof Moini only a tenure-accruing Associate Professor. Ex. 22.  The Provost's offer letter stated: "This appointment is for a three and one-half year contractual period with tenure-accruing status commencing with 2014-14 academic year. University policy permits the granting of early tenure [fast track] only in exceptional cases with the approval of the Provost.  In your case, you will serve in a tenure-accruing status for a period of three years and will be notified of the tenure decision no later than June 30, 2017.  Tenure, if approved, would become effective with the 2017-18 academic year…Acceptance of the appointment will constitute your acceptance of the conditions stated in the Faculty Code and Faculty Handbook and in this letter of offer." Ex. 22 (bracket from the original).  By granting a fast-track status the University acknowledged that Prof Moini was exceptionally well-qualified to teach at GWU.

 26. With a promise from the Chair (then Prof Weedn) that the transition to a tenured full Prof will be a breeze, Prof Moini accepted the position and began his work at the University on

January 1, 2014. He was assigned by Prof Rowe (program director) to teach two courses every semester, one of which was the critical one-credit Graduate Seminar, which Prof Moini co-taught with Prof Rowe until his tenure clock in September 2016, when Prof Rowe assigned him to be the sole instructor of the course, overseeing the student research of the entire MFS students until Prof Moini's departure in September 2018. Ex. 16. Regarding Prof Moini's teaching of Graduate Seminar, Prof Weedn under Department Head remarks of his Annual Report 2014-2015 wrote: "Prof Rowe has sufficient faith in him that he was allowed to be the primary course director for the critical Graduate Seminar-in this role he assists Prof Rowe in oversight of the independent research project of all MFS students." Ex. 18, P 18.

27. In mid 2016, Prof Weedn who was responsible for Prof Moini's hiring and for his supervision virtually the entire time leading up to his tenure and promotion decision was detailed to the Department of Justice as the Senior Forensic Advisor to the Deputy Attorney General, then Sally Yates, and Prof Rowe became the acting Chair when Prof Moini's Annual Report 2015-2016 and his package for tenure and promotion was to be submitted to the University. Ex. 5.

28. Even though the new FC 2015 with its new "excellent" requirements for research, teaching, and service had became effective only months before Prof Moini's submission of tenure and promotion package, Prof Moini success at GWU was already at the excellent levels. In his research he secured two funded National Science Foundation grants and two internal grants. He published 9 peer reviewed papers with his students in prestigious journals such as Analytical Chemistry, he presented several invited national and international presentations such as one at the Louvre Museum coordinated by the International Atomic Energy Agency; in total his group had more than 30 conference presentations. Between 2014-2017 his research was featured in local, national and international magazines such as GWU Hatchet, the prestigious

American Chemical Society magazine "Chemical and Engineering News", as well as Science Magazine. Ex. 23. The Chair of the Department (then Rowe) wrote: "His research is excellent." Ex., 16, P 15. The Appeals Panel wrote: "[a]ll members of the [hearing] panel agree that Prof Moini's scholarship is impressive."Ex. 8, P 2.

29. Based on the criteria published in Faculty Handbook (FH), Prof Moini Service was excellent. Ex. 10, P 28. In his service to the university, despite his short time at GWU, Prof Moini participated in various Departmental, University, local, national and international activities. Ex. 16-18, 23. He collaborated with several colleges within the University including the Medical School, Textile Museum, and School of Public Health. He also significantly elevated the standing of the Department with law enforcement institutions through his collaborations and publications with several federal agencies in his discipline, including US Secret Service, Smithsonian Institution, the US Naval Academy, and the FBI. Additionally, Prof Moini worked with local middle school and high school students by giving lectures and demonstrations to more than 70 students from underrepresented minority schools in the DC area for Carnegie Institute, as well as with several International Institutions (SOLEIL Synchrotron Facility, National University of Singapore, and International Atomic Energy Agency). Ex. 16-18, 23.  Prof Moini also regularly and actively participated in Departmental functions including meetings, student orientations, graduations ceremonies, and GWU alumni functions. He was also a member of several scientific societies such as American Chemical Society, the Academy of Forensic Sciences, and the American Society for Mass Spectrometry. Ex. 16-18, 23.

30. Teaching excellence is the only area of disagreement between the Plaintiff, Department Committee, the external peer review of teaching, and the Appeals Panel from one side and the University reviewing entities from the other side. In terms of teaching, Prof Moini

taught two courses every semester, including the critical one credit Graduate Seminar that he taught every semester. Prof Moini brought state of the art technology to the Department and incorporated them into the teaching curriculum. Because of this many Federal Institutions came to him for collaboration. Several of his students are now working with these and other law enforcement agencies such as the FBI, the US Secret Service, the ATF, etc. He also modernized his teaching labs by adding several new equipment that he obtained from the US Secret Service and the FBI worth >$200,000; assigned leading edge research to his research students, and updated the lectures to include modern analytical techniques. Ex. 16-18, 23. Prof Weedn (then Department Chair) wrote: "Particular to Prof Moini, he intentionally attempted to raise the standards of the Department and pushed students to improve their Research. I wholeheartedly supported Prof Moini in this. I do believe that the level and quality of research being conducted in the Department has substantially improved under his leadership…students vie to work with him on their research projects. He is known within our student body as being tough, but working closely and patiently with students to ensure that they understand what they are doing. The students that he has mentored have landed among the very best jobs." Ex. 5, P 2. Three peers from various colleges at GWU who visited Prof Moini's Graduate Seminar wrote a strong letter of support for him. Ex. 24, last letter. Peers from the Federal Institutions such as DEA, FBI, and ATF who visited or gave lectures in his Graduate Seminar class have praised his accomplishments in this class. The Appeals Committee who had access to Prof Moini tenure package wrote: "The record of Dr. Moini's teaching included letters from Dr. Moini's graduate students who secured good jobs upon graduation, praising Dr. Moini, along with acceptable student evaluations for Dr. Moini's other courses, and favorable peer reviews of his teaching." Ex. 8.

31. The Department Chair (then Prof Rowe) wrote: "His teaching in core forensic chemistry courses is well-regarded."Ex. 16.   Letters of support from Prof Moini's research students were all excellent. Exhibit 24, first 5 letters. Only Prof Moini's student evaluations from one credit Graduate Seminar courses were below departmental averages; however, the Department Chair (then Prof Rowe) in one his annual report 2016-2017 wrote: "part of the dissatisfaction of students with FORS 6292[Graduate Seminar] both semester is due to requirements dictated by our accreditation body, FEPAC." Ex. 25, P 20.   A former Chair of the Department (Prof Weedn) wrote: "Student feedback from these Graduate Seminar courses have traditionally been poor as this course challenges MFS students in ways that other courses do not; specifically Prof Rowe received similar negative student evaluations. Students, who despite explicit contrary advice, wait to do their research projects in the last semester are not uncommonly frustrated by the demand to accomplish publishable quality research prior to graduation." Ex. 5, P 1.   The University Appeals Committee who investigated Prof Moini's complaint wrote: "The one-hour graduate seminar in which Dr. Moini's evaluations were relatively poor, is a required course that all students must take twice, in their initial semester and their final semester. It is a relatively new course (started in 2013) and is quite demanding, the second time requiring the completion of a thesis. The course had been co-taught until very recently and the evaluations for the other Prof in this course were similarly negative." Ex. 8, P 3.

32. Based on his contract with GWU and with excellent level of achievements in research, teaching and scholarship, in September 2016, Prof Moini submitted his dossier for tenure and promotion to full Prof to the Department Committee. Ex. 26.

33. On or about November 2016, prior to Prof Weedn's return from the DOJ, when Prof Moini's package for tenure and promotion was being reviewed by the University's reviewing

entities, the CCAS Dean (then Vinson) abruptly removed Prof Weedn from his position as Chair, and on or about January 2017, in his place appointed Prof Rowe as the Department Chair, who continued arguing Moini's case with the reviewing entities. Prof Weedn wrote: "I was later relieved as Chair of the Department and have since heard that Prof Moini's Failure to be promoted was my fault." Ex. 5.

34. Therefore, during the preparation and submission of Prof Moini's dossier two major changes were happening: 1)  a new version of the FC with drastically different procedures for tenure and/or promotion was published, and 2) Prof Weedn (then Department chair) who was responsible for Prof Moini hiring and his supervision for virtually the entire time leading up to his promotion and tenure was abruptly replaced by the Dean/Provost with a new Department chair who was not well known for his support of diversity within both faculty and student body. These changes that were directed by the top administrators (Deans and the Provost, etc.) could have been responsible for the mishaps that the Provost is talking about in his letter to the Board of trustees.

35. However, based on Prof Moini's excellent accomplishments as well as favorable external peers reviewers of his research, teaching, and service in his disciplines, in October 2016, the Department Personnel Committee, consisting of Department tenured faculty, unanimously recommended Prof Moini's tenure. Also, the Department's full Profs unanimously recommended him for promotion to a full Prof.  Therefore the Department twice confirmed Prof Moini's excellence in scholarship, teaching and service.

36. Prof Moini's tenure and promotion package, including the Chair letter of transmittal, which explains to the University reviewing entities why Prof Moini should be granted tenure and

promoted to a full Prof, along with the Departmental Committee votes were submitted to CCAS School-Wide Personnel Committee (SWPC) and the University's reviewing entities.

37. According to the Hearing Committee Head (Prof Seavey), "the CCAS Promotion and Tenure Committee, whose recommendation to Dean Vinson is conveyed by that committee's chair, Prof Duff, himself not long away from a position in College administration. Relying just on teaching evaluations and specifically evaluations from the Research Seminar, the committee voted 5 to 2 with 2 abstentions against the award of tenure…Dean Vinson's message to the Provost reporting his non-concurrence with the Forensic Science does demonstrate his own individual review of the Moini dossier but concludes with citing a disaffected student's unhappy reaction to the Research Seminar as the deciding piece of evidence that Moini lacks excellence as a teacher." Ex.4, P 3-4, (emphasis added). Later Provost Maltzman, and President Knap, also did not concur with the recommendation of the Department Personnel Committee. This was when CCAS Dean and the Provost had pressured the Department to hire marginal students, had abruptly replaced Prof Weedn with Professor Rowe, and promoted him to the Department Chair in spite of the fact that he was the co-instructor of the Graduate Seminar and had received similarly poor student evaluations.

38. In April 2017 Prof Moini received an email from Provost Maltzman informing him that he is not concurring with the Department decision because "you [Moini] have not yet achieved the teaching standard commensurate with a promotion to Full Prof and grant of tenure."

Ex 3. (Emphasis added). Maltzman forwarded Prof Moini's case to the Faculty Senate Executive Committee (FSEC) for their decision." Ex. 2.

39.   To provide a document for Prof Rowe to show to the FSEC, Prof Moini asked Prof Rowe to provide the student evaluations of Graduate Seminar courses for other Profs who had taught that course. Prof Moini also prepared a letter and a PowerPoint presentation for Prof Rowe to present to FSEC in defense of Prof Moini's teaching accomplishments.   Prof Rowe declined to provide Prof Moini the student evaluation of Graduate Seminars for other Prof(s) and did not present Prof Moini's letter or the presentation to the committee. Ex. 15.   Later, FSEC sided with the administration and did not concur with the Department Personnel Committee.

40. In June 2017, Provost Maltzman notified Prof Moini that his "appointment for the 2017-18 academic year will be a terminal one." Ex. 3.

41. Per FC, in summer 2017, Prof Moini initiated a grievance proceeding by first filing an informal grievance.   To settle the grievance process, the University offered to extend Prof Moini's appointment by one semester till December 2018; however, Prof Moini rejected the offer (Ex. 24) and filed a formal grievance challenging the non-concurrences of the reviewing entities on the following bases: failure to comply with the Faculty Code, or Faculty Handbook, or other rules, regulations, and procedures established by the University; and arbitrary and capricious action on behalf of the University. Ex. 27.   Prof Moini did not invoke the discrimination charge against the University because most of evidences regarding this charge were discovered during

---

[3] The "teaching standard" referenced by the Provost has not been defined by him, Faculty Code (FC) or Faculty Handbook.  The Provost also did not use the term "teaching excellence" rather used "teaching standard".

the grievance process.  Prof Moini's argument regarding the first issue was that he was not given sufficient notice that his teaching evaluations were so poor as to form a basis to deny him tenure and promotion.

42. Vice Provost Bracey who represented the Dean and the Provost argued that because Prof Moini was on a fast track, no such reviews were necessary (Ex. 28); however, he provided no evidence from FC, FH, and provided no example from other fast track cases to support his claim. Both FC and FH recommend review in advance of tenure and promotion so the faculty member is able to address any shortcomings in a timely manner. Also, FC, FH or the letter of offer did not mention that such reviews are unnecessary for faculty on fast track.

43. Prof Moini's argument in regard to the second formal grievance issue was that the University's decision was arbitrary and capricious because it was primarily based on student evaluations of a one-credit Graduate Seminar course, ignoring all other teaching metrics listed in faculty Learning Center documents. Ex, 11, P 9.

44. On March 22, 2018, a three-member Hearing Panel conducted a hearing on Prof Moini's formal Grievance. By a vote of 2-1, the panel ruled against Prof Moini, writing: "There is no serious challenge to his [Moini] record of research and scholarship. The principal evidence against Moini come from the student evaluations of his teaching of the one-credit Graduate Seminar course…It is primarily in the consideration of the teaching evaluations for this one-credit course that the panel majority concurs that there has been no demonstrated arbitrary or capricious proceeding against Prof Moini…It is the judgment of the panel's majority that he has not demonstrated a readiness to adapt his teaching to the students he actually has." Ex. 4.

45. In April 2018, per Faculty Code, Prof Moini appealed the Hearing panel decision to the Appeals Panel. Ex. 29.   In the Appeal, Prof Moini also alleged that the University

representative (Vice Provost Bracey, Prof of Law) against the Faculty Code had ex parte communication with one of the Hearing Panel members. In reply Vice Provost Bracey argued against the Appeal, which was later rejected by the Appeals Panel. Ex. 30.  With regard to his undisclosed communication with a member of the Hearing Panel, Prof Bracey wrote: "But Dr. Moini himself concedes that the interactions were 'minor' and, in any case, there is nothing in the Faculty Code that would compel such a trivial revelation." Ex. 30, implicitly accepting that he had undisclosed association with a member of the Hearing panel prior to the Hearing Panel Meeting that he had not disclosed. (Ex. Video recording of the Hearing Panel meeting).

46. On June 1, 2018, the Appeals Panel (consisting of 10 Profs from various GWU colleges and departments including two Profs from Law School) met to hear Prof Moini's appeal.  (Ex. Video recording of the Appeals Panel meeting). The Appeals Panel concluded that: "The Appeals Panel unanimously finds the decision of the Hearing Panel to be seriously erroneous and overrules the decision." Ex. 8. They also wrote: "The record of Dr. Moini's teaching included letters from Dr. Moini's graduate students who secured good jobs upon graduation, praising Dr. Moini, along with acceptable student evaluations for Dr. Moini's other courses, and favorable peer reviews of his teaching. The one-hour graduate seminar, in which Dr. Moini's evaluations were relatively poor, is a required course that all students must take twice, in their initial semester and their final semester. It is a relatively new course (started in 2013) and is quite demanding, the second time requiring the completion of a thesis. The course had been co-taught until very recently and the evaluations for the other Prof in this course were similarly negative. Thus, to rely solely on the student evaluations of this one course, and disregard every other metric upon which teaching should be evaluated to deny tenure and promotion, as the reviewing entities did, is arbitrary and capricious and the finding by the majority that it is not is

seriously erroneous. This is especially true given Prof. Bracey's representation, on behalf of the CCAS Administration, that the poor student evaluations in that one course were sufficient to demonstrate lack of excellence in teaching; yet, he was unable to provide any specific objective metrics that were or can be used to measure excellence in teaching." Ex 8, P 3.

47. The Appeals Panel also recommended that "the non-concurrence of the university reviewing entities, challenged by Dr. Moini, be reversed and that Dr. Moini be granted tenure and promoted to full professor consistent with the recommendation of the Department Personnel Committee." Ex. 8.

48. Also, the Appeals Panel indicated "The Faculty Code requires that there be 'compelling reasons' for non-concurrence which includes 'failure by the recommending faculty to meet the burden of substantial evidence or otherwise provide adequate reasons, including insufficient support by external reviewers, to demonstrate that candidate meets, or fails to meet, the applicable standards of excellence' (FC IV.E.1. i), the basis relied upon in this case." Ex. 8, P 1.   As indicated above, none of the non-concurring reviewing entities had followed this definition of "compelling reasons", instead they all used the below average student evaluations in the one-credit Graduate Seminars as the "compelling reasons".

49. Based on the FC, the University should follow the recommendation of the Appeals Panel of the Dispute Resolution Committee unless the Provost has "compelling reasons". Ex. 7, P 31. On June 2018, Provost Maltzman responded to the Grievance Committee Appeals Panel recommendation stating: "In short, I am not following the recommendation of the Appeal Committee because the Appeal Committee, without good reason, disregarded the Hearing Panel's factual findings and conclusion that Dr. Moini failed to demonstrate by clear and convincing evidence that the decision against tenure and promotion was arbitrary and capricious,

and, through the grievance process, substituted its judgment for the judgment of the elected faculty bodies." Ex. 31, P 1.   Again the Provost did not follow the recommendation of Faculty Code with regard to the "compelling reasons", and equated student evaluations in the one credit Graduate Seminar to "teaching excellence" and ignored the two unanimous recommendations of the Department Committees for tenure and promotion; ignored the favorable recommendations of the external peer reviews, and the unanimous decision of the Appeals Panel.

50. Moreover, the Provost indicated that the letters of support from Prof Moini's students were not attached to the original tenure package. He also stated that "the Department Committee did *not* affirmatively state in its recommendation that Dr. Moini's teaching record met the university's standard of excellence. The Department Committee's silence on this point is important because the burden rests upon the Department to present sufficient evidence to demonstrate that the excellence standard has indeed been met in teaching as well as in research and service. The Department Committee's failure to meet that burden with respect to teaching served as the legitimate – and correct – basis for *every* subsequent reviewer in the tenure review process to non-concur with the Department Committee's recommendation." Ex. 31, P 4.   Firstly, this was the first time that during the entire Prof Moini tenure evaluation process and then the grievance process that the Provost has revealed that the Department did *not* affirmatively state in its recommendation that Prof Moini's teaching record met the university's standard of excellence. Secondly, the Provost did not provide a copy of the letter of transmittal to allow an independent judgment of the content of the letter.  In fact, after this letter from the Provost, Prof Moini emailed Prof Row and asked for the letter of transmittal.  Prof Rowe replied that he will ask from the Deans' Office if he could provide the letter, but he never did, implying that the administration blocked it. Ex. 32.   However, the fact that the Department Committees twice

unanimously recommended Prof Moini, once for the tenure case and once for the promotion to a full Prof as well as the Appeals Panel stating  that peer reviews of Prof Moini's teaching was favorable, indicate that Prof Moini's teaching meets standard of excellence in his field in spite of his below average student evaluations in the one credit Graduate Seminar. This was because Prof Rowe on Prof Moini annual report had indicated that the poor student evaluations in Graduate Seminars were in part due to the FEPAC requirements. Ex. 25.  Moreover, Prof Rowe himself had received similarly poor student evaluations in this course.  Ex. 33, 34. Thirdly, "a grievance procedure is not a formal judicial proceeding. Its purpose is to provide a fair evaluation of an allegation that a right or privilege has been violated." Ex. 7, P 29.  Therefore, even though an omission on the part of Department Committee may have happened, the Appeals Panel unanimously confirmed that Prof Moini teaching record met the university's standard of excellence. Fourthly, as discussed above this was a period of significant changes in the department and University: a) Dean/Provost had abruptly removed Prof Weedn (then Department Chair) and appointment Prof Rowe as the new chair, which put the whole tenure evaluation in disarray, and b) the introduction of a new FC 2015 with significant changes in tenure and promotion procedures just months before my tenure and promotion process was to begin.  Finally, both the Dean and the Provost knew that student dissatisfactions in Graduate Seminars are due to FEPAC requirements and acceptance of marginal students who had hard time meeting these requirements, as discussed by Prof Weedn (then the Department Chair). Ex. 5.  That is why the faculty Code has established a grievance process to address "errors"  during the tenure and promotion evaluations and provide "a fair evaluation of an allegation that a right or privilege has been violated." Ex. 5, P 29.  The fact that Provost Maltzman did not follow the Appeals Panel recommendation even after investigations by the Dispute Resolution Panels

demonstrate mean spirited and bias intent of Provost Maltzman.   During Provost Maltzman administration, the Department of Forensic Sciences full time faculty members have become completely undiversified and are now 100% Caucasian men. Ex. 6.

51. The Provost also indicated: " Although the dissenting member of the Hearing Panel supported Dr. Moini's tenure and promotion application, he too concedes that Dr. Moini's record does *not* meet the standard of excellence when he writes: 'Does the record indicate that Prof Moini is a *superb*[5] teacher. No.' Hearing Panel Decision (dissenting opinion) at 3 (emphasis in original).[6] Conceding that Dr. Moini did not meet the excellence standard,"   Ex. 29, P 6. Footnote 5 in his quotation refer to: " [5] A synonym of 'superb' is 'excellent.' See, e.g., https://www.merriam-webster.com/dictionary/superb." Id.    However,  in this  sentence the dissenting member of the Hearing Panel, is describing teachers in general terms.  Please recall that the FC 2015 clearly indicates that the candidates must meet excellence in their discipline. In fact just a few sentences below the sentence quoted by the Provost, the dissenting member of the Hearing Panel explain this.  He writes: "In my view there is discoverable evidence that Mehdi Moini's teaching does meet the standard of excellence in his field. I look to the publication records of his students. A teacher short of excellence cannot show his record in this regard. Faculty whose teaching addresses only graduate students ought not to be judged merely by their classroom performance." Ex 4, P 3.     This is a critical distinction that the Department Committee, and the external peer reviewers, the dissenting member of the Hearing Panel, and Appeals Panel all understood, but other reviewer entities including the Provost deliberately ignored to conceal their bias and racism against Prof Moini.  One must ask why the University Provost should try to confuse the readers by only quoting part of the Hearing Panel Chair's statement.

52. The Provosts also writes: "Significantly, Dr. Moini has scored roughly at or below departmental averages in virtually all of the courses he has taught at the university." Ex 31, P 4. This statement is not credible.  Firstly, prior to the tenure review, I only had three courses that were not Graduate Seminar.  From these three, the student evaluations for fall 2015 course was above the Department average. Ex.  Secondly, sometimes the Department average is also below the University average. Should we take this to mean nobody in the department is an excellent teacher?  How much below average constitutes that you are no longer an excellent teacher?  Where is this information written?  Third, there is no such rule in the FC that if your student evaluation average is below departmental average you are not an excellent teacher.  The Provost is using the student evaluations to discriminate against those not in lines with his system of belief or his country of origin, and violating the covenant of good faith and fair dealing.

53. Per Faculty Code, Prof Moini appealed the Provost's decision to the University Board of Trustees.  Ex. 36.  On September 19, 2018 the Executive Committee of the Board of Trustees informed Prof Moini that they have voted to uphold the university's decision against tenure and promotion, ending Prof Moini's appointment at the University. Ex. 37.

54. On August 20, 2018, weeks prior to the Board of Trustees final decision, Prof Rowe (then Department Chair) emailed Prof Moini to empty his office and return his key.  On August 23, 2018, when Prof Moini went to empty his office, he was told that Prof Rowe had asked a student to empty his office contents into boxes outside his office; belittling Prof Moini in front of faculty and students.  Prof Moini removed the boxes and returned his key on August 23, 2018. Ex. 38.

55. After obtaining evidences of discrimination by the University against him during the internal grievance process, Prof Moini filed Discrimination Based on Country of Origin with the EEOC, Washington DC, and received Right to Suit letter on July 19, 2019. Ex.39, 40.

**V**
**Discrimination Based on Country of Origin**

56. As shown in this complaint, from the very beginning GWU administration showed biased toward Prof Moini. While the Department Chair (then Prof Weedn) was discussing tenured full professor position with him, the GWU administration systematically down-graded his offer of employment. Ex. 20-22. The head of Hearing Panel wrote: "Prof Moini, who arrived with demonstrated eminence in his field and willingness to join a Forensic Sciences program then undertaking an attempted upgrade. He had tenure at the Smithsonian, but because that program is not purely an academic one with students proceeding to some degree, it was judged that his tenure there could not be transferred, a judgment that appears to have come down at the point where he had already separated from the Smithsonian and begun the cross-town transfer to GWU. In addition, the question of his rank arriving here shifted from indications then offered by then department chair Weedn in his negotiations with Moini. The provost provided for an initial rank of associate Prof with an accelerated decision on promotion and tenure." Ex. 4, P2.

57. After two years and nine months of great successes Prof Moini submitted his dossier for tenure and promotion. Ex. 26.  Because of his excellence in research, teaching and service in his discipline and favorable peer review of external reviewers in his discipline, the Department tenure and promotion committees each unanimously recommended him for tenure and promotion to full professor, respectively. However, the other University reviewing entities did not concur with the Department's recommendation, ostensibly because of Prof Moini's below-average student evaluations in one of his courses, a one-credit Graduate Seminar, which the program

director had assigned to Dr. Moini to teach every semester. Ex. 4, 8. The university provided no

other example that such a harsh treatment has been applied to any Caucasian Professor.  On the

contrary, the Dean and the Provost approved the promotion of a Caucasian Professor (Rowe) to

the Department Chair, even though this Professor had co-taught the same course with Prof Moini

and had received similarly poor student evaluations. Ex. 33, 34. It became apparent that the

University real motive was to get rid of Prof Moini just to keep the predominantly Caucasian

students at the forensic department happy.  Removing Prof Moini also removed the only non-

Caucasian full time faculty at the department.  The racism of the University policy has resulted

in a department in which 100% of its current full time faculty members are Caucasian men.

58. During the Appeals Panel meeting a Law School Prof argued against the University

action stating that his department has tenured and promoted faculty with worse teaching records.

Ex. Video recording of the Appeal Panel Proceeding.

59. The School-Wide Tenure and promotion Committee, the Dean, and the Provost and

their representative Vice Provost Bracey systematically used a few students' narrative comments

from the one credit Graduate Seminar to cover their real motive in denying Prof Moini tenure

and promotion. The Vice Provost Bracey wrote: "student evaluations from the Fall 2014 and

Spring 2015 semesters were made available to Prof. Moini, and included comments as 'Overall, I

do not think this course is a necessity and it felt like a large waste of time,' '[t]his course was not

challenging and the instructors were not very engaging,' 'this class was very much useless' and 'I

feel as though I have wasted valuable tuition money by taking this course as it is now.'.. Dean

Vinson also emphasized the empirical score deficiency, but noted that he was 'struck' by the

students' comments – particularly those that described the Prof. Moini's courses as 'useless' and

'a waste of valuable tuition money.'"  All of these comments were taken from the one credit

Graduate Seminars. Similar comments quoted by Dean Vinson on Prof Moini's Annual Report 2016-2017 were also from the Graduate Seminar. Ex 25, P 21.   This is when according to the President and Provost letter, there is a strong racism and bias in GWU student body.   On Feb 2018 the GWU President and Provost in their email to GWU community wrote: "Over the past few weeks, we and members of our staffs have participated in numerous meetings and town halls devoted to race relations on our campus.   Over and over we have heard from students who have discussed how the climate on campus leads students from underrepresented communities to feel unwelcome at DW.   Some students have even made clear that their treatment has led them to contemplate transferring.   The challenges that students of color have expressed about being a student at GWU are similar in nature to what we hear too often from faculty and staff of color." Ex.1, P1. Prof Moini alleges that students' bias against minority faculty also contributed to Prof Moini's below-average evaluations in a class in which 80-90% of students are Caucasian and mostly female students. While the University President and Provost were well aware of racism in the University, they ignored its effects on teaching evaluations of minority faculty.   Some of the students' comments were clearly biased against Prof Moini and originate from the notion that a minority Prof has no right to even ask question from students. Ex. 41-43

60. Prof Moini alleges that under the racially biased and discriminatory climate at GWU, and when the vast majority of students and Profs in the Department (Forensic Sciences) are Caucasian, using student evaluations as the primary deciding factor for denying his tenure and promotion is discriminatory. For example, consider student bias against Prof Moini in their comments regarding his "Fair Grading" in Graduate Seminars.   According to Provost Maltzman most students received a grade of A or A- from Prof Moini, Ex. 31; however, even on the question of Prof Fair Grading 32% of the students gave him 1 out of 5. Ex. 43.

61. The provost writes: "Significantly, Dr. Moini has scored roughly at or below departmental averages in virtually all of the courses he has taught at the university – prior to and following the tenure review. This is consistent with assessments of his teaching reflected in his 2013-14[3] and 2014-15[4] annual reviews. Perhaps implicitly conceding the undisputed record of his teaching as outlined above, the Department Committee did *not* affirmatively state in its recommendation that Dr. Moini's teaching record met the university's standard of excellence. The Department Committee's silence on this point is important because the burden rests upon the Department to present sufficient evidence to demonstrate that the excellence standard has indeed been met in teaching as well as in research and service. The Department Committee's failure to meet that burden with respect to teaching served as the legitimate – and correct – basis for *every* subsequent reviewer in the tenure review process to non-concur with the Department Committee's recommendation." Firstly, the first sentence is not credible.  Prior to my tenure review I only received three student evaluations for core forensic courses.  In one of those my average was above the Department and school average. Ex. 35. Secondly, The second sentence is also not credible, because I did not teach any courses in 2013-2014, because when I started at GWU in January 2014, when the courses had been already assigned.  My annual review for 2014-15 is very positive.  The screenshot of Prof Moini's teaching evaluation by the Department is shown below. Ex. 18, P 17.  As shown there is nothing negative about this evaluation.  In fact it states that "Prof Rowe has sufficient faith in him that he was allowed to be the primary course director for the critical Graduate Seminar." Any unbiased person will interpret this statement as a

very positive statement.  The action of the Provost cannot be interpreted anything but being bias.

**B. Evaluation of teaching**

*Prof Moini taught the following courses during AY 2014-15:*
*Fall 2014*
*FORS 6200 Selected Topics I Advanced Instrumental Analysis*
*FORS 5292 Graduate Seminar, co-taught with Walter Rowe (primary)*

*Spring 2015*
*FORS 6232 Forensic Chemistry II, co-taught with Mehdi Moini (primary)*
*FORS 5292 Graduate Seminar, co-taught as primary, with Walter Rowe*

*Prof Rowe has been integrating him into the course curriculum and giving him increasing responsibilities. Prof Rowe has sufficient faith in him that he was allowed to be the primary course director for the critical Graduate Seminar—in this role he assists Prof Rowe in oversight of the independent research projects of all MFS students.*

62. The Chair of the Hearing Panel wrote: "The outcome if this proceeding has been to discredit a scholar and scientist eminent in his field, someone whose work has elevated the standing of Forensic Sciences at this university. The evidence for how dubious that proceeding has been can be traced to the embrace of an inadequate mode of assessing teaching voiced by one of the leaders of the Columbian College and systematically followed through each stage of review." Ex. 4, P 4.  The rest of the statement by the Provost is not credible either, because the department twice unanimously voted for Prof Moini, once for his tenure and once for his promotion to a full Professor.

63. After the administration denied Prof Moini tenure and promotion and while he was still in the grievance process, the Department Chair (then Rowe) humiliated Prof Moini in front of students and faculty by asking one student to evacuate his office. Ex. 38.

64. Defendant's termination of Prof Moini's employment has already caused him, and will continue to cause him, significant financial loss (in the form of lost compensation and benefits).

65. This assault on Prof Moini's career has caused him significant emotional distress, damage to his career and reputation, anxiety, humiliation, and loss of enjoyment of life.

66. The discriminatory actions at issue in this case were taken by the highest officers of the university, and were wanton, willful and malicious and were intended to and did cause Prof Moini substantial injuries.

67. The discrimination that GWU has engaged in this case is similar to its unlawful treatment of other highly competent minority Profs, and if left undeterred, Defendant will continue to engage in such egregious and unlawful conduct in the future.

68. As an institution, GWU has condoned and ratified this discrimination and at a minimum has recklessly disregarded Prof Moini's rights to be free from such discrimination.

## VI

### Arbitrary and Capricious Action

69. Prof Moini also claims the University action not to grant him tenure and promotion to a full Prof was arbitrary and capricious as stated by the unanimous decision of the Appeals Panel of the University Dispute Resolution committee. After 3 years of successful scholarship, teaching, and service at GWU, per his contract Prof Moini applied for tenure and promotion to a full Prof, which was unanimously supported by the department; however, the administration did not concur with the Department recommendation and terminated his appointment, ostensibly because of the relatively poor student evaluations of his one-credit Graduate Seminar courses.

70. The Hearing panel Head who investigated Prof Moini's Case writes: " The evidence for arbitrary and capricious proceedings regarding Prof Moini can be seen in the Columbian College Associate Dean Arnes[e]n's memorandum of guidance to the school's department chairs, dated 16 May 2017, where he offers this statement: "And just to be clear . . Student evaluations, in my view, are an imperfect tool for measuring teaching evidence and quality. But for the moment it's the tool we have and we need to use it carefully. So if you see genuine teaching problems in the numbers and student narrative comments, you need to address these in your evaluation section.' The call is for clarity, and a reader might have anticipated that following the acknowledgement of the imperfection of this standard, some direction would be offered regarding correctives to it. Instead the guidance remains that the process will rely on this imperfect tool. In particular in the case of graduate teaching, which consists less of classroom performance than on direction given to the advancement of advanced research proficiency, one would have anticipated if not clarity at least something other than acquiescence to a defective standard." Ex. 4, P 2.

71. The Hearing panel Head also states: "The evidence for arbitrary and capricious proceeding in relation to Moini's case begins with the CCAS Promotion and Tenure Committee, whose recommendation to Dean Vinson is conveyed by that committee's chair, Prof Duff, himself not long away from a position in College administration. Relying just on teaching evaluations and specifically evaluations from the Research Seminar, the committee voted 5 to 2 with 2 abstentions against the award of tenure. Deciding that a vote on promotion had been rendered moot by the denial of tenure, there was no vote on promotion. It is impossible to know how the abstentions might have voted. Thus the committee apparently accepted the concept that teaching evaluations constitute a sufficient basis for assessing teaching. I believe that

equivalence is intellectually dubious, as even Associate Dean Arnes[e]n's characterization hints." Ex. 4, P 3.

72. Dispute Resolution Committee Appeals Panel writes: "The record of Dr. Moini's teaching included letters from Dr. Moini's graduate students who secured good jobs upon graduation, praising Dr. Moini, along with acceptable student evaluations for Dr. Moini's other courses, and favorable peer reviews of his teaching. The one-hour graduate seminar in which Dr. Moini's evaluations were relatively poor, is a required course that all students must take twice, in their initial semester and their final semester. It is a relatively new course (started in 2013) and is quite demanding, the second time requiring the completion of a thesis. The course had been co-taught until very recently and the evaluations for the other Prof in this course were similarly negative. Thus, to rely solely on the student evaluations of this one course, and disregard every other metric upon which teaching should be evaluated to deny tenure and promotion, as the reviewing entities did, is arbitrary and capricious and the finding by the majority that it is not is seriously erroneous." Ex. 8, P 3.

## VII

### Breach of Contract

73. Prof Moini's offer letter, which was a binding contract stated: "Acceptance of the appointment will constitute your acceptance of the conditions stated in the Faculty Code and Faculty Handbook and in this letter of offer.  Any subsequent change or amendments to the Faculty Code or Faculty Handbook will become a part of the contract as of the effective date of the change or amendment." Ex 4.  According to GWU "The Teaching Portfolio Guidelines for Tenure & Promotion", "The Teaching Portfolio Guidelines for Tenure & Promotion What Should a Dossier Contain?" It discusses 5 required components: A. Teaching Statement and

Reflection; B. Courses taught during period of evaluation; C. Teaching Effectiveness; D. Development and Continual Improvement; and E. Impact on Department, GW, and the Discipline. One of these components, the Teaching Effectiveness has also 5 components. "1. (Required) Internal peer reviews. 2. (Required) Student feedback and comments provided by department. <u>Departments should assemble representative student feedback, striving to avoid a mere reporting of ratings, and provide a meaningful analysis that includes comparisons with similar courses (with similar enrollments) taught by others.</u> 3. External peer reviews. Departments may also provide at least one letter from a colleague who is not in the department and who observes the candidate's teaching. 4. Student letters. 5. Teaching awards or other special recognition." Ex. P

74. The University breached its employment contract by their discriminatory and their arbitrary and capricious actions discussed above.

75. The University breached its employment contract by not following the faculty performance reviews guidelines listed in FC, Faculty Handbook (FH), and the University Teaching and Leaning Guidelines that are commonly done for other faculty on tenure track including not providing feedbacks and notice of any concerns about his teaching in the years leading up to the tenure application and never indicated that student evaluations in a one credit course was so critical as to form a basis to deny him tenure and promotion, Ex. 7, 10, 11. The Faculty Code and Faculty Handbook recommend giving advance notice to a faculty member of any significant issues or concerns that might negatively affect his or her candidacy for tenure, with sufficient time for the Prof to make adjustments or corrections to address those concerns before a decision is made in the formal tenure review process. As noted above, GWU hired Prof Moini on January 1, 2014. He submitted his dossier for tenure and promotion in September

2016. During this period Prof Moini had three Annual Reports but the third and final one was only weeks away from his deadline to submit his dossier for tenure and promotion, and therefore only two of his Annual Reports would have been useful for his dossier. Both of those reports were extremely positive.  Also, pursuant to his contract with the University, GWU should have provided Prof Moini with mid-tenure review so as to provide [Plaintiff] with feedback on [his] progress toward meeting the standards for promotion and tenure stated in this document, and to provide supportive guidance and direction toward the successful completion of the promotion and tenure process. GWU breached this term of the contract.  Prior to the Provost recommending that his candidacy for tenure be denied (supposedly due to lack of excellence in teaching) the administration did not meet with Prof Moini as was proposed by Dean Arnesen in his letter to Chairs and Program Director. Ex. 9.  They did not provide any written reports, guidance, suggestions or a corrective course of action.  The only negative comment that was given only weeks before his dossier due date was to improve the graduate seminar.  A simple corrective measure could have been to change his course and let someone else to teach this course.  But neither the Department nor the University suggested this change and program director systematically assigned Prof Moini to teach this course, because the department was very happy with its outcome. Ex. 5. There were no comments on Prof Moini annual reports prior to his tenure review indicating that his tenure was in danger.  In fact recommendations on these annual reviews were that he should continue as a faculty in the Department. Ex. 16, P 15.  The University's silence on this point is important and implies that the University was deliberately setting up Prof Moini to continue to receive low student evaluations so that they could use those evaluations to deny his tenure and promotion. Contrary to student evaluations of this course, however, every peer review of Prof Moini's performance in Graduate Seminar was positive. At

no point prior to his tenure review did the administration comply with the obligation to provide Plaintiff with feedback and guidance that would address any putative concerns regarding his teaching.

76. Prof Moini internal complaint regarding breach of contract with respect to lack of timely review by the University administration was filed with the GWU Dispute Resolution Committee on August 15, 2017; however, both the Dispute Resolution Committee Hearing Panel and the Appeals panel did not address Prof Moini's complaint in their decisions.  The Appeals Panel wrote: "The Hearing Panel decision did not address Dr. Moini's procedural argument that the university failed to comply with the Faculty Code and/or other rules. Dr. Moini's argument in this regard was that he was not given sufficient notice that his teaching evaluations were so poor as to form a basis to deny him tenure and promotion. Prof. Bracey, in turn, argued that Dr. Moini must have been aware of his poor teaching evaluations given his access to them and that he went to the University Teaching Center. The Appeals Panel finds it quite disturbing that the University would use a Prof's outreach to the Teaching Center as a basis to argue notice of poor teaching rather than a sincere interest to improve on one's existing teaching. The Appeals Panel urges the University to view such conduct as a sign of a Prof's sincere interest in our students and in improving their teaching. Nevertheless, since the Hearing Panel decision did not address this issue, this Appeals Panel decision will not address that argument." Ex. 8, P 2.  In Prof Moini's case, the tenure and grievance processes took about two years (September 2016 when he submitted his tenure and promotion package to September 2018, the GWU Board of Trustees final decision), and Prof Moini filed his lawsuit on October 15, 2019. The complaint to the Dispute Resolution Committee; however, was filed internally in mid 2017; therefore, the lack of timely reviews by the University falls within the three year limitations period.  Moreover,

defendant had a continuing duty to provide plaintiff feedback through 2016-2017 academic year because Prof Moini teaching evaluations 2017-2018 was still used by the Provost in his letter to the GWU Board of Trustees: He wrote: "Significantly, Dr. Moini has scored roughly at or below departmental averages in virtually all of the courses he has taught at the university – prior to [2014-2016] and following [2017 through May 2018] the tenure review." Ex.31, P 4. Had the administration given Prof Moini sufficient notice that his teaching evaluations in Graduate Seminars were so poor as to form a basis to deny him tenure and promotion, he would have requested a course reassignment which would have helped improving his student evaluations for academic year 2017-2018. The Provost states that: " Furthermore, the Faculty Code makes clear that candidates for tenure and promotion should not only demonstrate excellence at the time the application is under consideration, but the capacity to sustain excellence in the future." Ex. 31, P 3. The provost used this argument to justify his action to look at evidences that were not part of the grievance process; indicating that the 2016-2017 evaluation, which was completed in August 31, 2017 should be used as a cutoff date for calculation of the DC law for a three-year statue of limitation on contract claims. ; *see also Allison v. Howard Univ.* , 209 F.Supp.2d 55, 59 (D.D.C. 2002), citing *Ehrenhaft v. Malcolm Price, Inc.* , (D.C. 1984) ("To maintain a cause of action on an express or implied contract in the District of Columbia, a plaintiff must bring a lawsuit within three years following the accrual of the claim."). "An action for breach of contract generally accrues at the time of the breach." *Wright v. Howard Univ.* , (D.C.2013).


77. The University breached its employment contract by not providing any metrics for measuring "teaching excellence" and discriminatory equating student evaluations and

specifically of the one credit seminar course to "teaching excellence", Ex. 8, P 3. As discussed above, the student evaluations (especially the one credit problematic course that program director assigned to Prof Moini to teach) are only part of the teaching metrics and not the sole barometer of teaching excellence.  Moreover, during the internal grievance process and in this lawsuit the low student evaluations in Graduate Seminar and the fact that no matter who taught the course received similar student evaluations were discussed.  The School Wide Committee, the Dean, and the provost ignored these facts and ostensibly relied only on student evaluation and even on that only used the student evaluations in the one-credit Graduate Seminar to deny Prof Moini's tenure and promotion. If we compare Prof Moini's teaching accomplishments with these guidelines, it will become clear that he has met most of these requirement, which will put him on the excellent range. The university did not follow these guidelines and arbitrary and capriciously and ostensibly used the student evaluations in the one credit Graduate Seminar as measure of excellence; thereby breaching its contract.

78. The University breached its employment contract by the administration abuse of the term "compelling reason". As discussed before, the reviewing entity including the School Wide Committee, the Dean, and the provost definition of "compelling reason" is not consistent with that of the Faculty Code.  "The following may constitute compelling reasons for a School-Wide Personnel Committee, a dean or the Provost to independently concur or nonconcur with a faculty recommendation (see Section D.3; see Procedures for the Implementation of the Faculty Code, Section B.5): i. Failure by the recommending faculty to meet the burden of substantial evidence or otherwise provide adequate reasons, including insufficient support by external reviewers, to demonstrate that candidate meets, or fails to meet, the applicable standards of excellence;

ii. Failure to conform to published tenure or promotion policies, procedures, and guidelines; or

iii. Arbitrary, capricious, or discriminatory action at any point in the process." However, The University primarily used student evaluations in the one credit Graduate Seminar as the "compelling reason". Ex.7, P 12.

79. The University also breached their contract and discriminated against Prof Moini by systematically denying him of privileges described in the Faculty Code including: 1) inspection of "all relevant documents in the control of the other party and not privileged and may offer such documents or excerpts therefrom in evidence"; and the 2) recommended faculty review including mid-tenure review, which are commonly done for other faculty.." Ex. 7, P 29.

80. The University breached its employment contract by the forbidden ex parte communications of the University representative (Vice provost Bracey) with Hearing panel member and not disclosing it. Ex. 7, P 29. With regards to Vice Provost Bracey undisclosed communication with a member of the Hearing Panel, Prof Bracey wrote: "But Dr. Moini himself concedes that the interactions were 'minor' and, in any case, there is nothing in the Faculty Code that would compel such a trivial revelation." Ex. 30, implicitly accepting that he had undisclosed association with a member of the Hearing panel prior to the Hearing Panel Meeting that he had not disclosed. (Ex. Video recording of the Hearing Panel meeting).

81. The University breached its employment contract by introducing new evidences in the appeal process that were not introduced in the hearing Process. Such as new evidences introduced in the Provost letter to the Board of Trustees (Ex. 31), which is against the FC. Ex. 7, P 30.

## VIII
## Exhaustion of Administrative Remedies

82.     Prof Moini's claims of discrimination under 42 U.S.C. § 1981, and his breach of contract claims require no exhaustion of administrative remedies.  He has complied with the exhaustion of administrative remedies requirements of Title VII of the Civil Rights Act of 1964, by timely filing a charge of discrimination based on country of origin with the United States Equal Employment Opportunity Commission.  Plaintiff's claims of discrimination under the District of Columbia Human Rights Act were tolled by that filing.  The EEOC issued a notice of right to sue on these claims on July 19, 2014.  All prerequisites to suit have been satisfied, and this lawsuit is timely filed.

## IX

## VIOLATIONS OF LAW

## X

## COUNT ONE

**(COUNTRY OF ORIGIN DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 AND THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT)**

83.     Paragraphs 1-82… are re-alleged.

84.     Defendant's actions as described above discriminated against Plaintiff because of his race, in violation of the District of Columbia Human Rights Act and Title VII of the Civil Rights Act of 1964.

## XI

## COUNT TWO

## (ARBITRARY AND CAPRICIOUS DECISION)

85.     Paragraphs 1-82… are re-alleged.

86.     By denying him tenure and terminating his employment without providing him notice of putative concerns regarding his teaching, Defendant's actions as described above breached its contractual obligations toward Plaintiff.   These actions caused Plaintiff damages including the loss of his employment, and past and future salary and benefits.

## XII

### COUNT THREE

### (BREACH OF CONTRACT)

87.     Paragraphs 1-82 are re-alleged.

88.     Defendant interfered with Plaintiff's right to make and enforce contracts protected by 42 U.S.C. § 1981, as defendant has maintained a custom or policy of subjecting minority Profs to disparate and more demanding standards for tenure and/or promotion than similarly situated white Profs.

## XIII

### COUNT FOUR

### (BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

89.     Paragraphs 1-82 are re-alleged.

90.     By denying him tenure and terminating his employment without providing him notice of putative concerns regarding his teaching, Defendant's actions as described above breached the implied covenant of good faith and fair dealing underlying the contract between the parties.   These actions caused Plaintiff damages, including the loss of his employment, and past and future salary and benefits.

## XIV

### WHEREFORE, Plaintiff requests that this Court:

1)     Declare that Defendant has violated the law, and enjoin Defendant from any further acts of discrimination and/or retaliation against Plaintiff;

2)      Order that Defendant reinstate Plaintiff into his position of employment, with tenure, and promote him to the position of Full Prof, retroactive to the date he was unlawfully deprived of this position;

3)      Order that Defendant make Plaintiff whole for all past financial loss, including back pay and benefits, retroactive to the date of his unlawful termination.

4)      Award Plaintiff compensatory damages in an amount to be proven at trial;

5)      Award Plaintiff punitive damages in an amount to be proven at trial;

6)      If the Court determines, for whatever reason, not to reinstate Plaintiff into his employment with UDC, then alternatively, award Plaintiff front pay to compensate for his future financial loss;

7)      Award Plaintiff the costs and reasonable attorneys' fees incurred in this action;

8)      Award Plaintiff pre-judgment interest on all monetary sums requested above;

9)      Award such other relief as the Court deems just.

## XV

## JURY DEMAND

Plaintiff requests trial by jury on all issues in this case.

Mehdi Moini

732 Ridge Dr.

McLean, VA 22101

512-736-8650