## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| **MEHDI MOINI**, |
| Plaintiff, |
| v. |
| **THOMAS J. LEBLANC**, *in his official capacity as President, George Washington University*, |
| Defendant. |

Case No. 1:19-cv-03126 (TNM)

## <u>MEMORANDUM OPINION AND ORDER</u>

George Washington University (the "University") denied tenure to Mehdi Moini, Ph.D. Moini, proceeding *pro se*, alleges that this decision violated Title VII of the Civil Rights Act of 1964 ("Title VII"), the D.C. Human Rights Act ("DCHRA"), and 42 U.S.C. § 1981. He also claims that the University breached its contractual obligations. University President Thomas J. LeBlanc ("the President") moves to dismiss the Complaint. The Court finds that Moini's claims under Title VII and the DCHRA are time-barred, so it will dismiss them. But the Court will not dismiss his other claims. Given the liberal pleading standards for *pro se* plaintiffs, Moini has alleged enough facts at this stage to proceed with his § 1981 claim and his contract claims. The Court will thus grant in part and deny in part the President's motion to dismiss.

### I.

Moini describes himself as "a Middle Eastern (Iranian)" individual. Compl. ¶ 5, ECF No. 1. He holds a doctorate in chemistry from Michigan State University. *Id.* ¶ 24. From 1987 to 2014, he held several academic and research positions, including at the Smithsonian

Institution.  *Id.*; Compl. Exs. at 282,[1] ECF No. 1-5.  He joined the faculty of George Washington University in 2014 as a tenure-track associate professor in the Department of Forensic Sciences. Compl. ¶ 25.  The appointment was for a period of three and a half years, so he would receive a tenure decision no later than June 2017.  *Id.*

In accepting the position, Moini agreed to "the conditions stated in the Faculty Code and Faculty Handbook."  *Id.* ¶ 12.  The Code contains the criteria for tenure.  *Id.* ¶ 13.  As of 2015, it provided that "tenure is reserved for members of the faculty who demonstrate excellence in scholarship, teaching, and engagement in service and who show promise of continued excellence."  *Id.*  The lynchpin of this case is the "excellence in teaching" criterion.

Moini alleges that he built a strong record in all areas—scholarship, teaching, and service.  *Id.* ¶¶ 28–30.  For example, he published nine peer-reviewed papers, collaborated with federal agencies, and gave presentations at local schools.  *Id.* ¶¶ 28–29.  And many colleagues and students have praised his teaching.  *Id.* ¶ 30.  But he acknowledges that student evaluations from a graduate seminar he taught were "relatively poor" and "below departmental averages." *Id.* ¶¶ 2, 31.

This seminar is mandatory for graduate students, and Moini describes it as "quite demanding."  *Id.* ¶¶ 2, 10.  For a time, he co-taught the course with a colleague, Professor Rowe, who "received similar negative student evaluations."  *Id.* ¶ 31.  Soon after Rowe stepped down as a co-instructor, he received a promotion to Department Chair.  *Id.* ¶¶ 26, 33.

Moini submitted his tenure application in September 2016, which triggered a multi-step review process.  *Id.* ¶¶ 17, 32.  First, a committee of tenured faculty in the Department of Forensic Sciences "unanimously" recommended tenure.  *Id.* ¶ 35.  This recommendation went to

---

[1]  All page citations refer to the page numbers that the CM/ECF system generates.

the Personnel Committee for the University's College of Arts and Sciences.  *Id.* ¶ 36.  The

Personnel Committee was to provide its "independent concurrence or nonconcurrence" with the

Department's recommendation and to identify any "compelling reasons" for nonconcurrence.

Compl. Exs. at 29.  It voted five to two *against* tenure, with two abstentions.  Compl. ¶ 37.

According to Moini, the Committee focused on the negative student evaluations from his

graduate seminar.  *Id.*

      The next stop was the Dean of the College of Arts and Sciences.  *Id.*  Like the Personnel

Committee, he disagreed with the Department's recommendation of tenure.  *Id.*  The Dean

allegedly cited "a disaffected student's unhappy reaction to the [graduate seminar] as the

deciding piece of evidence that Moini lacks excellence as a teacher."  *Id.* (quoting Compl. Exs. at

9).

      The Provost also disagreed with the Department's recommendation of tenure.  *Id.*  He

concluded that Moini had "not yet achieved the teaching standard commensurate with a . . . grant

of tenure."  *Id.* ¶ 38. (quoting Compl. Exs. at 3).

      Since the Provost did not concur with the Department's recommendation, he referred the

matter to the Executive Committee of the Faculty Senate.  *Id.*; Compl. Exs. at 39.  This body

voted against tenure, too.  Compl. ¶ 39.  Finally, the University President reviewed Moini's case

for a "final decision."  *Id.* ¶ 37; Compl. Exs. at 39–40.  He decided against tenure.  Compl. ¶ 37.

      So, after six of levels of review, one body—the Departmental Committee—recommended

tenure.  The subsequent five reviewers—the College's Personnel Committee, the Dean, the

Provost, the Executive Committee of the Faculty Senate, and the President—did not.  The

Provost informed Moini by letter dated June 22, 2017, that "the decision ha[d] been made not to

extend tenure" to him.  Compl. Exs. at 5.  The letter also stated that Moini's appointment for the 2017–2018 academic year would be "a terminal one."  *Id.*

Moini soon began a grievance process.  Compl. ¶ 41.  He first sought an informal resolution.  *Id.*; Compl. Exs. at 44.  The University offered to extend Moini's appointment by one semester, but Moini rejected this and brought a formal grievance.  Compl. ¶ 41.

He made two allegations.  First, he claimed that the University had violated the Faculty Code because it did not give him "sufficient notice" that his student evaluations were poor enough to put his tenure at risk.  *Id.*  Second, he complained that the denial of tenure was "arbitrary and capricious" because it was "primarily based on student evaluations of a one-credit graduate seminar course, ignoring all other teaching metrics."  *Id.* ¶ 43.

A three-member Hearing Panel reviewed Moini's grievance and upheld the denial of tenure by a split vote.  *Id.* ¶ 44.  For the panel majority, while there was "no serious challenge to his record of research and scholarship," his teaching was "short of excellent."  Compl. Exs. at 6.  Based "primarily" on the student evaluations from Moini's graduate seminar, the Panel concluded that he had "not demonstrated a readiness to adapt his teaching to the students he actually has."  *Id.*  The dissenting member criticized the heavy reliance on the student evaluations.  *Id.* at 7–9.  He cited the College's own memorandum of guidance stating that "[s]tudent evaluations . . . are an imperfect tool for measuring teaching evidence and quality."  *Id.* at 7.

An Appeals Panel unanimously reversed the Hearing Panel's decision, finding it "seriously erroneous."  Compl. ¶ 46; Compl. Exs. at 53.  In its view, the denial of tenure was "arbitrary and capricious" because it was "based solely on student evaluations of a one-credit hour required seminar course, with no other supporting documentation."  Compl. Exs. at 54.  The

record, it noted, included "letters from Dr. Moini's graduate students who secured good jobs upon graduation, praising Dr. Moini, along with acceptable student evaluations from [his] other courses, and favorable peer reviews of his teaching." *Id.* So the Appeals Panel recommended granting him tenure. *Id.* at 53.

But that was not the end. The Provost has authority to reject the recommendation of the Appeals Panel, and he did so here. Compl. ¶ 49. Among the "compelling reasons" for doing so was the Code's "excellence in teaching" standard, which, in his view, the Appeals Panel had not applied correctly. Compl. Exs. at 687–91.

The Provost then forwarded Moini's grievance to the University's Board of Trustees for the final say. Compl. ¶ 53. The Board "voted to uphold the university's decision against tenure." Compl. Exs. at 760. The University informed Moini of the Board's decision on September 19, 2018. *Id.*

The next year, on April 14, Moini sent an "initial inquiry" to the Equal Employment Opportunity Commission ("EEOC"). *Id.* at 763. He then filed a formal Charge of Discrimination on July 12. Def.'s Mem. in Supp. of Mot. to Dismiss at 50 ("Def.'s Mem."), ECF No. 6-1. He alleged that the University had discriminated against him based on "national origin." *Id.* at 51. The EEOC soon mailed him a Notice of Right to Sue, Compl. Exs. at 772, which he received on July 19, Compl. ¶ 55.

Within three months, Moini sued. He claims violations of Title VII and the DCHRA (Count I), as well as 42 U.S.C. § 1981 (Count III). *Id.* ¶¶ 84, 88. He also alleges that the University "breached its contractual obligations" by denying him tenure "without providing him notice of putative concerns regarding his teaching." *Id.* ¶ 86 (Count II). For the same reason, he

asserts that the University "breached the implied covenant of good faith and fair dealing" (Count IV). *Id.* ¶ 90.[2]  He seeks reinstatement, tenure, back pay, and damages. *Id.* at 42–43.

## II.

The President moves to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6). Def.'s Mot. to Dismiss at 1, ECF No. 6.  To survive this motion, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In assessing plausibility, the Court may consider only "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [it] may take judicial notice." *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017).  And it must generally "accept as true all of the complaint's factual allegations and draw all reasonable inferences in favor of the plaintiff[]." *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 272 (D.C. Cir. 2018).  But the Court need not accept a complaint's factual allegations "insofar as they contradict exhibits to the complaint." *Id.* at 272–73.  Nor need it credit legal conclusions couched as factual allegations. *Id.* at 272.

The Court is mindful that Moini is proceeding without counsel.  "A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (cleaned up).  More, the Court must assess a *pro se* complaint "in light of all

---

[2]  The Court has federal-question jurisdiction over Moini's claims under Title VII and 42 U.S.C. § 1981.  28 U.S.C. § 1331.  It has supplemental jurisdiction over his DCHRA claim and his contract claims. *Id.* § 1367(a).

filings, including filings responsive to a motion to dismiss." *Brown v. Whole Foods Mkt. Grp., Inc.*, 789 F.3d 146, 152 (D.C. Cir. 2015) (cleaned up).

## III.

## A.

The President contends that Moini's claims under Title VII and the DCHRA (Count I) are untimely. Dismissal on this basis is appropriate when a claim is "conclusively time-barred" on the face of the Complaint. *Firestone v. Firestone*, 76 F.3d 1205, 1209 (D.C. Cir. 1996). That is the case here. Indeed, the timing issue largely comes down to the proper application of a Supreme Court decision.

Start with Title VII. To sue under this statute, an individual must first file a charge with the EEOC "within [180] days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). This limitations period extends to 300 days if the individual "has initially instituted proceedings with a State or local agency." *Id.*

The first question—which turns out to be dispositive here—is when "the alleged unlawful employment practice occurred." The President argues that it occurred on June 22, 2017, when the Provost informed Moini of the decision to deny him tenure and that his appointment for the 2017–2018 academic year would be terminal. Def.'s Mem. at 28. Moini points instead to September 19, 2018, when the Board of Trustees made a final decision on his grievance. Pl.'s Opp'n at 27, ECF No. 8. Under *Delaware State College v. Ricks*, 449 U.S. 250 (1980), he is mistaken.

*Ricks* bears striking similarities to Moini's case. Just consider the question presented: "whether respondent, a college professor, timely complained under the civil rights laws that he had been denied academic tenure because of his national origin." *Id.* at 252. The Tenure

Committee at Delaware State College twice voted to deny tenure. *Id.* The Faculty Senate upheld the decision. *Id.* And in March 1974, the College's Board of Trustees "formally voted to deny tenure." *Id.*

Unhappy with this decision, Ricks filed a grievance with the Board's Educational Policy Committee. *Id.* Meanwhile, the Board informed him on June 26, 1974, that "he would be offered a 1-year 'terminal' contract that would expire June 30, 1975." *Id.* at 252–53. It referenced the pending grievance, explaining that if the Educational Policy Committee recommended granting tenure—and if the Board agreed with the recommendation—then Ricks would get tenure after all. *Id.* at 253 n.2. But three months later, the Board notified Ricks that "it had denied his grievance." *Id.* at 254.

Ricks filed a charge with the EEOC in April 1975. *Id.* He then sued, bringing a Title VII claim. *Id.* Ruling on a motion to dismiss, the district court held that this claim was untimely. *Id.* at 254–55. The limitations period began to run on June 26, 1974, and Ricks had filed his EEOC charge more than 300 days after that date. *Id.* at 255, 260 n.13.

The Supreme Court agreed, reversing the Third Circuit's contrary ruling. *Id.* at 256. The first task was to identify "the alleged unlawful employment practice." *Id.* at 257. It concluded that Ricks alleged unlawful denial of tenure, not unlawful termination of employment. *Id.* at 257–58; *see also id.* at 262–63 (Stewart, J., dissenting) (agreeing with the majority "that the unlawful employment practice alleged in the . . . complaint was a discriminatory denial of tenure, not a discriminatory termination of employment").

To plead the latter, Ricks would have needed to allege that the College terminated him in a discriminatory manner relative to other professors who had been denied tenure. *Id.* at 258 (majority opinion). But he did not. *Id.* Indeed, Ricks's termination was simply an

"inevitable . . . consequence of the denial of tenure." *Id.* at 257–58.  So Title VII's clock began

not when this *consequence* came to pass, but "at the time the tenure decision was made and

communicated to Ricks." *Id.* at 258.

The next task was to identify this date. *Id.* at 259. It came down to two candidates. One

option was September 12, 1974, when "the Board notified Ricks that his grievance had been

denied." *Id.* at 260. The other option was June 26, 1974, when "the Board notified Ricks that he

would be offered a 'terminal' contract for the 1974–1975 school year." *Id.* at 261–62.[3] The

Court rejected the September 12 date for the June 26 date.

In support of the September 12 date, the EEOC, as *amicus*, offered two arguments. *Id.* at

260. First, it urged that the decision to deny tenure "was only an expression of intent that did not

become final until the grievance was denied." *Id.* Indeed, the June 26 letter "explicitly held out"

the possibility that Ricks "would receive tenure if the Board sustained his grievance." *Id.* The

Court acknowledged this. *Id.* at 261. But it still found that "[e]ntertaining a grievance

complaining of the tenure decision does not suggest that the earlier decision was in any respect

tentative." *Id.* More, "[t]he grievance procedure, by its nature, is a *remedy* for a prior decision,

not an opportunity to *influence* that decision before it is made." *Id.*

The EEOC also maintained that "the pendency of the grievance period should toll the

running of the limitations period[]." *Id.* But this argument failed too. It was settled that "the

---

[3] The Board informed Ricks of the decision to deny tenure *earlier* than June 26.  449 U.S. at
252.  June 26 was when it offered him a "terminal" contract.  *Id.* at 253.  The Court did not have
to consider the pre-June 26 date since even June 26 was more than 300 days before Ricks filed
his EEOC charge.  *Id.* at 260 n.13, 262 n.17.  Here, the University informed Moini on the *same
day* that (1) it had denied him tenure and (2) his appointment for the upcoming academic year
would be "terminal."  Compl. Exs. at 5.  That day was June 22, 2017.  *Id.*  So this June 22 date is
equivalent to the June 26, 1974, date in *Ricks*.

pendency of a grievance, or some other method of collateral review of an employment decision, does not toll the running of the limitations period[].”  *Id.*

So for these reasons, September 12—the day that Ricks received a final decision on his grievance—was *not* when Title VII’s limitations period began to run.

Turning to the June 26 date, the Court observed that by then, “the tenure committee had twice recommended that Ricks not receive tenure; the Faculty Senate had voted to support the tenure committee’s recommendation; and the Board of Trustees formally had voted to deny Ricks tenure.”  *Id.* at 262.  “In light of this unbroken array of negative decisions,” the district court “was justified in concluding that the College had established its official position—and made that position apparent to Ricks—no later than June 26, 1974.”  *Id.*  His EEOC charge was thus untimely, since he filed it more than 300 days after June 26.  *Id.* at 260 n.13.

*Ricks* governs here.  The only unlawful employment practice that Moini alleges is the denial of tenure.  Compl. ¶ 1; *see* Pl.’s Opp’n at 40.  He does not allege unlawful termination of employment, since he does not claim that the University terminated him in a discriminatory manner relative to other professors who had been denied tenure.  *See* Pl.’s Opp’n at 16, 26–27; *Ricks*, 449 U.S. at 258.  So Title VII’s clock began to run “at the time the tenure decision was made and communicated to [Moini].”  *Ricks*, 449 U.S. at 258.

That occurred on June 22, 2017, when the Provost notified Moini that “the decision has been made not to extend tenure” and that his appointment for the 2017–2018 academic year would be “terminal.”  Compl. Exs. at 5; *see Ricks*, 449 U.S. at 261–62 & n.17.  By June 22, five reviewers had decided against tenure, including the University President, whose decision on the matter is “final,” per the Faculty Code.  Compl. Exs. at 40.  So the University had established its

"official position" by this date.  449 U.S. at 262; *see supra* note 3 (noting the equivalency between the June 22, 2017, date in Moini's case and the June 26, 1974, date in *Ricks*).

This is so even though Moini filed a grievance challenging the tenure decision.  *See Ricks*, 449 U.S. at 260–61.  The existence of a grievance process did not make the tenure decision "tentative."  *Id.* at 261.  And "the pendency of a grievance . . . does not toll the running of the limitations period[]."  *Id.*  So the conclusion of the grievance process was not "when the tenure decision was made."  *Id.* at 259, 261.

Yet Moini insists that the relevant date is September 19, 2018, when he received a final decision from the Board of Trustees on his grievance.  His arguments are unpersuasive.

For one, he suggests that under the Faculty Code, a decision on tenure does not become "final" until the end of the grievance process.  *See* Pl.'s Opp'n at 27; Pl.'s Proposed Sur-Reply at 3–4.[4]  This argument, which conflates the tenure review process and the grievance process, fails for two reasons.

First, it contradicts the Faculty Code, which he attached as an exhibit to his Complaint. The Court need not accept a plaintiff's factual allegations "insofar as they contradict exhibits to the complaint."  *Owens*, 897 F.3d at 272–73.  The Faculty Code cleanly distinguishes between

---

[4]  Moini has moved for leave to file this sur-reply.  Pl.'s Mot. for Leave to File at 1, ECF No. 10. The President opposes this motion, arguing that his reply brief introduced no new arguments. Def.'s Opp'n to Mot. for Leave at 1, ECF No. 12; *see Ben-Kotel v. Howard Univ.*, 319 F.3d 532, 536 (D.C. Cir. 2003) (noting that sur-replies are appropriate when a reply brief presents new arguments).  The Court agrees with the President here and thus denies the motion.  Moini cites no new argument that the President makes in his reply brief, and none is apparent.  Moini instead asserts that the reply brief contains factual inaccuracies.  Pl.'s Mot. for Leave to File at 1.  But in any event, the proposed sur-reply would not affect how the Court resolves the President's motion to dismiss.  In this Section, the Court rejects the arguments that Moini makes in his proposed sur-reply on the timeliness of his Title VII and DCHRA claims.  (These arguments are intertwined with the ones he raises in his opposition brief.)  And nothing in the proposed sur-reply affects the Court's decision to allow Moini's other claims to proceed.  *See infra* Sections III.B & III.C.

the tenure review process and the grievance process.  *See* Compl. Exs. at 28–30, 36.  In the former, the Provost's decision is normally "final," with exceptions.  *Id.* at 39.  One exception is when, as here, the College's Personnel Committee, the College's Dean, and the Provost all disagree with the Department's recommendation.  *Id.*  When this happens, the tenure application goes to the Faculty Senate and then the President, who makes "a final decision."  *Id.* at 39–40.  If the President "approve[s] tenure," then the decision is "transmitted to the Board of Trustees, which has the authority to confer tenure."  *Id.* at 40.  Thus, since the President did not approve Moini's tenure, the Board was not involved in the tenure review process, and the President's adverse decision was "final."  *See* Compl. ¶¶ 37–40; Compl. Exs. at 40.[5]

So under the Faculty Code, the grievance process is simply a way to mount a collateral attack on the President's final decision—it does not make that decision any less final.  *See* Compl. Exs. at 28–30, 36; *Ricks*, 449 U.S. at 261.  Moini focuses on a paragraph in the Code's grievance section that speaks of a "Final Disposition."  Pl.'s Proposed Sur-Reply at 4.  But this paragraph is about the final decision in the grievance process, not the tenure review process.  *See* Compl. Exs. at 49.  With any grievance process, just as with any tenure review process, there will be a "final" decision.  That mere fact, however, does not make the final decision in the grievance process the proper focal point.  *See Ricks*, 449 U.S. at 260–61.

This leads to the second independent reason Moini's argument here falls short: under *Ricks*, it fails as a matter of law.  In suggesting that a decision in the tenure review process does not become "final" until the end of the grievance process, he asks the Court to focus on the final decision in the grievance process.  But *Ricks* was categorical that the final decision in the

---

[5]  For this reason, Moini is wrong when he suggests that the Board of Trustees always makes the final decision in the tenure review process.  *See* Pl.'s Opp'n at 27; Pl.'s Proposed Sur-Reply at 3.

grievance process is not the proper focal point.  A grievance procedure, "*by its nature*, is a *remedy* for a prior decision, not an opportunity to *influence* that decision before it is made."  *Id.* at 261 (first emphasis added); *see also id.* at 261 n.15 ("Mere requests to reconsider . . . cannot extend the limitations periods applicable to the civil rights laws.").  Moini points to no material differences between the grievance process here and the one at issue in *Ricks*, nor are any apparent.  *See* Pl.'s Opp'n at 27; Pl's Proposed Sur-Reply at 3–4.  Nor does he claim that the process he went through was *not* a "grievance process"—he uses that precise term.  Compl. ¶ 41.  Thus, since *Ricks*—at the motion to dismiss stage—rejected the grievance process as the proper focal point, *see* 449 U.S. at 254, 260–61, the Court will do the same here.[6]

Moini also contends that the Court should use September 19 because the EEOC "accepted" that date.  Pl.'s Opp'n at 27.  This argument runs headlong into *Ricks*.  If the question was what date the EEOC had "accepted," the Court would not have engaged in any analysis of "when the tenure decision was made and Ricks was notified."  449 U.S. at 259.  It would have just asked what date the EEOC had "accepted."  But it did not.  *See id.* at 259–62.  So the date that Moini wrote on his EEOC form—and any date the EEOC "accepted"—does not control.

Finally, Moini alleges that he did not obtain "most" evidence of the University's discrimination against him until the grievance process.  Compl. ¶¶ 41, 55; *see also* Pl.'s Proposed Sur-Reply at 4 ("[A]s discussed in the Complaint, the EEOC [charge] and this Complaint were

---

[6] Relatedly, Moini at times suggests that the Court should use the September 19 date simply because that is when the Board of Trustees provided its decision.  *See* Pl.'s Opp'n at 27 ("[T]he Supreme Court ruled the date the Delaware State College <u>Board of Trustees</u> made its final decision to be the final day of employment for Ricks.  September 19, 2018 was when Moini received the University's Board of Trustees final decision.").  But this gets *Ricks* backwards.  Its selection of the June 26 date turned not on the identity of the decisionmaker, but on the nature of the decision.  *See* 449 U.S. at 260–62.  Here, the Board of Trustees gave Moini a final decision on his grievance, but that decision is the wrong focal point.  *See* Compl. ¶¶ 37–41, 53; Compl. Exs. at 760; *supra* note 5; *Ricks*, 449 U.S. at 260–61.

filed when abundant evidences of racial discrimination by the University against the Plaintiff . . . were obtained during the grievance process[.]"). Moini does not explain why this would mean that the limitations period began on September 19. Perhaps he is intimating that he was not fully aware of the alleged discrimination before the grievance process concluded. But as the President points out, Moini suggests elsewhere in his Complaint that he suspected bias from the outset. Def's Mem. at 28–29; *see* Compl. ¶ 56. And documents that he filed *during* the grievance process—as early as November 2017—charge that the University was "biased" against him. Compl. Exs. at 400, 416.

In any event, other judges in this District have concluded that "[n]otice or knowledge of discriminatory motivation is not a prerequisite for a cause of action to accrue." *Fortune v. Holder*, 767 F. Supp. 2d 116, 122 (D.D.C. 2011) (quoting *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 558 (10th Cir. 1994)). Rather, "it is knowledge of the adverse employment decision itself that triggers the running of the statute of limitations." *Id.* Courts of appeals agree. *See Hamilton v. 1st Source Bank*, 928 F.2d 86, 88–89 (4th Cir. 1990) ("To the extent that notice enters the analysis, it is notice of the employer's actions, *not* the notice of a discriminatory effect or motivation, that establishes the commencement of the pertinent filing period."); *Merrill v. S. Methodist Univ.*, 806 F.2d 600, 604–05 (5th Cir. 1986) (same).

Indeed, *Merrill* reached this conclusion by relying on *Ricks*. *See* 806 F.2d at 605. The plaintiff in *Merrill* proposed that the court "focus on the date the victim first perceives that a discriminatory motive caused the act, rather than the actual date of the act itself." *Id.* But this proposal was "inconsistent" with *Ricks*, the "leading case on this subject." *Id.* It clashed with *Ricks*'s teaching that "the Title VII limitations period is partially designed to 'protect employers from the burden of defending claims arising from employment decisions that are long past.'" *Id.*

(quoting *Ricks*, 449 U.S. at 256–57); *accord Cada v. Baxter Healthcare Corp.*, 920 F.2d 446,

450 (7th Cir. 1990) ("The discovery rule is implicit in the holding of *Ricks* that the statute of

limitations began to run 'at the time the tenure decision was made *and communicated* to

Ricks[.]'" (quoting *Ricks*, 449 U.S. at 258)).

Thus, because June 22, 2017, was when the University notified Moini that it had denied

him tenure and that his appointment for the upcoming academic year would be "terminal," that is

when "the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1).

From here, the analysis is straightforward.  Moini filed his charge with the EEOC no

earlier than April 14, 2019.  Compl. Exs. at 763.[7]  That is well more than 300 days after June 22,

2017.  So Moini's Title VII claim is time-barred, and the Court will dismiss it.  *See* 42 U.S.C.

§ 2000e-5(e)(1); *Ricks*, 449 U.S. at 254–55, 256 & n.7, 260 n.13.[8]

**B.**

As for Moini's DCHRA claim, it is also time-barred.  An individual must file a DCHRA

claim "within one year of the unlawful discriminatory act, or the discovery thereof."  D.C. Code

---

[7]  April 14 was when Moini sent an "initial inquiry" to the EEOC.  Compl. Exs. at 763.  As the President points out, he filed his formal charge on July 12.  Def.'s Mem. at 27 n.11, 50.  But even the earlier date was well more than 300 days after June 22, 2017.

[8]  As the President notes, arguably Moini had only 180 days—not 300 days—to file his EEOC charge.  Def.'s Mem. at 29 n.15.  Moini does not allege that he "initially instituted proceedings with a State or local agency" before filing with the EEOC.  42 U.S.C. § 2000e-5(e)(1).  At most, when he filed his EEOC charge, it was "automatically cross-filed with the D.C. Office of Human Rights pursuant to a work-sharing agreement."  *Epps v. Potomac Elec. Power Co.*, 389 F. Supp. 3d 53, 59 (D.D.C. 2019).  Other judges in this District have concluded that, in this circumstance, the 180-day limitations period applies.  *See, e.g.*, *id.* at 59–60; *Ashraf-Hassan v. Embassy of France*, 878 F. Supp. 2d 164, 170–71 (D.D.C. 2012); *but see Chambers v. District of Columbia*, 389 F. Supp. 3d 77, 86–87 (D.D.C. 2019), *appeal filed*, No. 19-7098 (D.C. Cir.) (relying on *Carter v. George Wash. Univ.*, 387 F.3d 872, 879 (D.C. Cir. 2004)).  If the 180-day period applies, Moini's Title VII claim is untimely *even if* the clock began on September 19, 2018, rather than June 22, 2017.  The date of Moini's initial EEOC inquiry—April 14, 2019—was more than 180 days after September 19, 2018.

§ 2-1403.16(a); *see Estenos v. PAHO/WHO Fed. Credit Union*, 952 A.2d 878, 885 (D.C. 2008).

But "timely filing a claim with the [EEOC], which in turn cross-files with DCHRA, tolls the time

for filing a private cause of action under D.C. law." *Estenos*, 952 A.2d at 882, 886.

The one-year limitations period for the DCHRA began to run on June 22, 2017.  The

D.C. Court of Appeals generally relies on decisions of federal courts in Title VII cases when

applying the DCHRA.  *See Daka, Inc. v. Breiner*, 711 A.2d 86, 94 (D.C. 1998).  Indeed, that

court has expressly followed *Ricks* many times.  It has done so to conclude that the one-year

limitations period for wrongful termination claims begins to run when the employee is "notified

*unequivocally* of his termination." *Barrett v. Covington & Burling LLP*, 979 A.2d 1239, 1252

(D.C. 2009) (quoting *Stephenson v. Am. Dental Ass'n*, 789 A.2d 1248, 1252 (D.C. 2002) (also

following *Ricks*)).  And it has relied on *Ricks* to hold that "review of the final termination

through grievance proceedings did not make the termination less final, nor did plaintiff's availing

herself of grievance procedures toll the time for statutory action." *Jones v. Howard Univ.*, 574

A.2d 1343, 1346–47 & n.5 (D.C. 1990) (cleaned up).

*Barrett*, *Stephenson*, and *Jones* did not even involve a denial-of-tenure allegation, yet the

D.C. Court of Appeals followed *Ricks* in those cases.  So it would surely do so in a case that *does*

involve that allegation.  Thus, the limitations period for Moini's DCHRA claim began to run

when Title VII's limitations period began to run under *Ricks*.  That date is June 22, 2017.

Moini brought his DCHRA claim on October 16, 2019.  That was far too late.  It makes

no difference that Moini filed an EEOC charge.  He did not do so until April 2019 at the earliest,

*after* the one-year limitations period expired in June 2018.  And in any event, the rule is that

"*timely* filing a claim with the [EEOC]" tolls the limitations period for a DCHRA claim.

*Estenos*, 952 A.2d at 882 (emphasis added).  As explained in the Title VII discussion, Moini did

not "timely" file his EEOC charge.  For these reasons, Moini's DCHRA claim is untimely and

the Court will dismiss it.  *See* D.C. Code § 2-1403.16(a); *Estenos*, 952 A.2d at 885–86.

Since the Court is dismissing Moini's Title VII claim and his DCHRA claim, it will

dismiss Count I of the Complaint.  *See* Compl. ¶ 84.

## C.

The University President next urges the Court to dismiss Moini's claim under 42 U.S.C.

§ 1981 (Count III).  But this time, Supreme Court precedent cuts in Moini's favor.

Under § 1981, "[a]ll persons . . . shall have the same right in every State . . . to make and

enforce contracts . . . as is enjoyed by white citizens."  To state a claim under this statute, "the

plaintiff must allege that (1) [he] is a member of a racial minority; (2) the defendant intended to

discriminate against [him] on the basis of race; and (3) the discrimination concerned an activity

enumerated in § 1981."  *Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 91 (D.D.C. 2019).

The President contends that Moini "failed to sufficiently plead the first two elements."  Def.'s

Mem. at 33.  The Court disagrees, given the low pleading bar and the even "less stringent

standards" that apply to *pro se* complaints.  *Erickson*, 551 U.S. at 94.

On the first element, the President argues that Moini has alleged discrimination because

of *national origin*, rather than discrimination because of race.  Def.'s Mem. 33–34.  The

President believes that Moini's self-description as "Middle Eastern" and "Iranian" is about

national origin, not race.  *Id.* at 33.  And because § 1981 protects against discrimination because

of race, but *not* national origin, the President concludes that Moini has no claim under this

statute.  *Id.* (citing *Nono v. George Wash. Univ.*, 245 F. Supp. 3d 141, 147 (D.D.C. 2017)).

The reality is not so clear-cut.  Once again, we have a Supreme Court decision on point:

*Saint Francis College v. Al-Khazraji*, 481 U.S. 604 (1987).  The plaintiff in that case—an

17

associate professor—was "a citizen of the United States born in Iraq." *Id.* at 606.  The College

denied him tenure, so he filed a *pro se* complaint raising claims under Title VII and § 1981.  *Id.*

The district court ruled that § 1981 "does not reach claims of discrimination based on Arabian

ancestry." *Id.*  The Third Circuit reversed.  It held that the plaintiff "had alleged discrimination

based on race and that although under current racial classifications Arabs are Caucasians, [he]

could maintain his § 1981 claim." *Id.* at 607.  Section 1981, in its view, reached "discrimination

directed against an individual because he or she is genetically part of an ethnically and

physiognomically distinctive sub-grouping of *homo sapiens*." *Id.*

This time, the Supreme Court agreed with the Third Circuit.  *Id.*  The Court had "little

trouble in concluding" that § 1981 protects "identifiable classes of persons who are subjected to

intentional discrimination solely because of their ancestry or ethnic characteristics." *Id.* at 613.

"Such discrimination," the Court reasoned, is "racial discrimination that Congress intended

§ 1981 to forbid, whether or not it would be classified as racial in terms of modern scientific

theory." *Id.*  So the bottom line was this: if a plaintiff "can prove that he was subjected to

intentional discrimination based on the fact that he was born an Arab, rather than solely on the

place or nation of his origin . . . he will have made out a case under § 1981." *Id.*

Given *Saint Francis College*, Moini has pled "racial discrimination" under § 1981 if he

has alleged that the University discriminated against him "solely because of [his] ancestry or

ethnic characteristics." *Id.*  The President insists that Moini has not done so.  Def.'s Reply at 7–

8, ECF No. 9.  He points out that the Complaint, at several points, refers simply to discrimination

because of "national origin" or "country of origin." *Id.* at 8; *see, e.g.*, Compl. ¶ 4.  The President

also observes that Moini checked the box for "national origin"—not "race"—on his EEOC

charge.  Def.'s Mem. at 33, 50.

As support, the President relies mainly on *Ndondji v. InterPark Inc.*, 768 F. Supp. 2d 264 (D.D.C. 2011), a decision that grappled with how to apply *Saint Francis College*. The plaintiff—who had counsel—raised § 1981 claims, but Judge Bates dismissed them. *Id.* at 269, 275. He refused to endorse the plaintiff's "attempt to blur race and national origin." *Id.* at 273.

The plaintiff alleged that his former employer treated "Americans" differently from "foreign nationals." *Id.* For Judge Bates, a distinction between "Americans" and "foreign nationals" was a distinction based on country of origin, not "ancestry or ethnic characteristics." *See id.* The plaintiff identified as an "Angolan," but he never explained "why identifying oneself as 'Angolan' should be considered a 'very distinct' ancestral or ethnic characteristic rather than a person's place of birth or origin." *Id.* at 274. In short, the "clear thrust" of the complaint was "national origin discrimination." *Id.* And the plaintiff's EEOC charge "reinforce[d]" this reading, since he had checked off the "national origin" box instead of the "race" box. *Id.*

Judge Bates's opinion is thorough and well-reasoned. Moini's § 1981 claim can proceed only because there are a few differences between his case and *Ndondji*. For one, he describes himself as "Middle Eastern"—not just "Iranian"—which suggests a focus on "ancestry or ethnic characteristics," rather than just country of origin. *Cf. Saint Francis College*, 481 U.S. at 613 (holding that an Iraqi native could make out a § 1981 claim if he could prove discrimination "based on the fact that he was born an *Arab*" (emphasis added)).

Moini also describes other professors—who the University allegedly treated more favorably—as "Caucasian," "white," and "of European descent." Compl. ¶¶ 1, 7, 57, 60, 88. Use of these terms suggests racially tinged discrimination within the meaning of § 1981. *Cf. Saint Francis College*, 481 U.S. at 610 ("Plainly, all those who might be deemed Caucasian today were not thought to be of the same race at the time § 1981 became law."). Contrast his

allegations with those of Ndondji, who "never identifie[d] . . . the races of other similarly situated employees who were allegedly treated more favorably than he was."  768 F. Supp. 2d at 275.

And unlike Ndondji, Moini is proceeding *pro se*.  The Supreme Court drew a subtle distinction in *Saint Francis College*.  A plaintiff must prove discrimination based on his "ancestry or ethnic characteristics," rather than discrimination based on "the place or nation of his origin."  481 U.S. at 613.  The two concepts are connected.  *Cf. id.* ("It is clear . . . that the civil rights sections of the 1870 Act provided protection for immigrant groups such as the Chinese.").  The Court is mindful of the "less stringent standards" that apply to *pro se* complaints.  *Erickson*, 551 U.S. at 94.  Given these lower standards—and given that Moini does make *some* allegations suggesting discrimination because of "ancestry or ethnic characteristics"—he has done just enough to plead a § 1981 claim.[9]

The Court does not find it dispositive that Moini checked the "national origin" box on his EEOC form instead of the "race" box.  The President cites no authority suggesting that a *pro se* plaintiff forfeits a § 1981 claim by doing so.  *See* Def.'s Mem. at 33–34; Def.'s Reply at 7–8. Even in *Ndondji*—not a *pro se* case—the failure to check the "race" box on the EEOC form was just one factor in the analysis.  *See* 768 F. Supp. 2d at 273.

The President's next argument for dismissal focuses on the second element of a § 1981 claim—the causation element.  A plaintiff must plausibly allege that his "ancestry or ethnic

---

[9]  The President footnotes two decisions other than *Ndondji*, but neither warrants a different conclusion.  Def.'s Reply at 8 n.2.  In one case, the plaintiff had counsel, and the court rejected his § 1981 claim on summary judgment, rather than at the pleading stage.  *Kalantar v. Lufthansa German Airlines*, 402 F. Supp. 2d 130, 133, 137–38 (D.D.C. 2005).  In the other case, the court dismissed a *pro se* plaintiff's § 1981 claim because it was "solely based on the fact that he is from Afghanistan."  *Amiri v. Hilton Wash. Hotel*, 360 F. Supp. 2d 38, 42 (D.D.C. 2003).  For the reasons stated, Moini has done just enough to avoid the same fate.

characteristics" were the "but for" cause of the defendant's actions.  *See Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020).  As the President sees it, Moini has not plausibly alleged but-for causation.  Def.'s Mem. at 34–39; Def.'s Reply at 9–11; Def.'s Notice of Suppl. Authority at 1–2, ECF No. 14.

The Court disagrees.  The federal rules set forth "liberal pleading standards."  *Erickson*, 551 U.S. at 94.  And *pro se* complaints are subject to even less stringent standards.  *Id.*  Given the low bar, Moini has done enough to plead but-for causation.

The essence of Moini's Complaint is that the University denied him tenure on the pretext of his poor student evaluations, when the real reason was his ancestry or ethnic characteristics.  *See* Compl. ¶¶ 1, 5, 57, 60.  He makes some allegations that, liberally construed, support this claim.  For example, he asserts that "100%" of the tenured professors in the Department of Forensic Sciences are, unlike him, "Caucasian" and "of European descent."  *Id.* ¶¶ 7, 57.  He observes that denying him tenure maintained this status quo.  *Id.* ¶ 57.  He also offers Professor Rowe as a comparator.  Rowe received a promotion to Department Chair, even though he had "received similarly poor student evaluations" from the same graduate seminar.  *Id.*  More generally, Moini alleges "a toxic atmosphere of racism and bias" at the University.  *Id.* ¶ 1.  And "[w]hile the University President and Provost were well aware" of this racism, "they ignored its effects on teaching evaluations of minority faculty."  *Id.* ¶ 59.

Moini's allegations also plausibly suggest that the stated reason for denial of tenure—his poor student evaluations—was pretextual.  His tenure application went through six levels of review, and his grievance went through four levels.  Most of his reviewers recommended against tenure, but not all.  The Departmental Committee "unanimously" recommended tenure.  *Id.* ¶ 35.  The Appeals Panel was also unanimous in voting to uphold Moini's grievance.  *Id.* ¶ 46; Compl.

Exs. at 53.  This Panel found it troubling that others had relied so heavily on the poor student evaluations.  Compl. Exs. at 54.  So too did the dissenting member of the initial Hearing Panel. *Id.* at 7–9.  That dissenter cited an internal memorandum for the College of Arts and Sciences stating that "[s]tudent evaluations . . . are an imperfect tool for measuring teaching evidence and quality."  *Id.* at 7.  That could be relevant.  *See Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 n.3 (D.C. Cir. 2008) (noting that an employee can "try to cast doubt on an employer's asserted reason" by pointing to "the employer's failure to follow established procedures or criteria").

To be clear, the Court is not saying that Moini will ultimately be able to prove his case. Far from it.  He has his work cut out for him.  For example, it is not clear that Rowe is an appropriate comparator.  Moini invokes the University's decision to promote Rowe to Department Chair.  Compl. ¶ 57.  But the standards governing that decision might differ from the standards governing tenure.  And differences would be relevant.  *See Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) ("A plaintiff must . . . demonstrate that all of the relevant aspects of his employment situation were nearly identical to those of the other employee." (cleaned up)).

More, there is the issue of pretext.  Even if the University had no *good* reason to deny Moini tenure, that need not mean its reason was *pretextual*.  *See Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("[T]he issue is not the correctness or desirability of the reasons offered . . . but whether the employer honestly believes in the reasons it offers." (cleaned up)).  The pleading stage is an especially low bar for *pro se* plaintiffs, and today the

Court holds only that Moini's § 1981 claim clears that low bar. So the Court will not dismiss Count III.[10]

## D.

The Court will also not dismiss any of Moini's contract claims at this stage (Counts II and IV). The issues surrounding these claims are fact-bound. Questions of what obligations the University had and whether it breached any of those obligations depend heavily on how to interpret the Faculty Code. The Court thinks it best to wade into these issues—if ever—at summary judgment.[11] For now, the Court holds only that Moini has plausibly alleged one or more contract claims, particularly given his *pro se* status. *Erickson*, 551 U.S. at 94.

To state a claim for breach of contract under D.C. law, a plaintiff must allege: "(1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009). The statute of limitations for these claims is three years. D.C. Code § 12-301(7).

---

[10]  After briefing was complete, Moini moved to add an exhibit to his opposition brief. Mot. for Leave to Amend, ECF No. 13. It is a faculty petition calling for the University President to resign because of "racist remarks." *Id.* at 1. The purpose of this motion is to help corroborate Moini's claim of race discrimination. *See id.* at 3. The Court will deny this motion as untimely, since it came nearly two months after he filed his opposition brief. In any event, the proposed exhibit would not affect the Court's conclusions here. Moini has done enough to plead a § 1981 claim based on his Complaint and the exhibits he attached to it. And the proposed exhibit has nothing to do with the timeliness of his Title VII and DCHRA claims. Moini is free to include this exhibit at the summary judgment stage. *See* Fed. R. Civ. P. 56(c)(1)(A).

[11]  If the Court ends up denying the § 1981 claim at summary judgment, it may decide not to exercise supplemental jurisdiction over any remaining contract claims. *See* 28 U.S.C. § 1367(c)(3).

The President reads Counts II and IV of Moini's Complaint as raising three claims for breach of contract.  Def.'s Mem. at 40–44.  His arguments for dismissing them now are unpersuasive.

*First*, Moini alleges a breach based on the University's failure to provide him with enough notice of the concerns about his teaching.  Compl. ¶¶ 86, 90.  The President urges that Moini's exhibits "refute" his own allegations on this point.  Def.'s Mem. at 40.  For example, the President points to faculty evaluations that Moini received before he applied for tenure.  *Id.*  But *some* notice does not necessarily mean *enough* notice.  This issue requires closer attention to what communications the University had with Moini about his teaching and what communications—if any—the Faculty Code requires.

*Second*—and relatedly—Moini alleges that he did not receive a "mid-tenure review."  Compl. ¶¶ 16, 79.  The President says this claim is time-barred under D.C.'s three-year statute of limitations because it would have accrued no later than September 2015—"midway between his start date of January 1, 2014 and the end of his initial appointment on June 30, 2017."  Def.'s Mem. at 40–41.  But the President's unstated assumption here is that a "mid-tenure review" must occur by the exact midway point.  For now, he has not provided enough basis for this assumption.

*Third*, Moini alleges that denying him tenure was an "arbitrary and capricious" action, which the Faculty Code forbids.  Compl. ¶ 2.  The President stresses that courts "generally give deference" to the decisions that universities make, including tenure decisions.  Def.'s Mem. at 42 (citing *Brown v. George Wash. Univ.*, 802 A.2d 382, 385 (D.C. 2002)).  Even so, Moini has made a plausible allegation of an "arbitrary and capricious" decision.  For example, recall that the Appeals Panel and the dissenting member of the Hearing Panel found it troubling that others

24

had relied heavily on the student evaluations.  *See supra* Section III.B.  At summary judgment, the Court will be in a better position to consider how much deference to give the University.

The President also seeks dismissal of any other "sundry" contract claims that Moini alludes to in his Complaint.  Def.'s Mem. at 44–47.  These include allegations that the University failed to provide "metrics for measuring teaching excellence" and that it did not follow its own procedures during the grievance process.  Compl. ¶ 3.  The Court will not parse these allegations now.  They are intertwined with Moini's other contract claims.  More, they are fact-bound and touch on fine details of the Faculty Code.  *See* Def.'s Mem. at 45–46.

The President urges the Court to dismiss some of these contract claims because, at the very least, Moini suffered no damages.  *Id.*  He contends that under D.C. law, proof of actual damages is an element of a contract claim.  *Id.* at 45 & n.30.  This may not be correct.  *See Wright v. Howard Univ.*, 60 A.3d 749, 753 (D.C. 2013) ("Even where monetary damages cannot be proved, a plaintiff who can establish a breach of contract is entitled to an award of nominal damages.").  At best, there is a conflict within the caselaw on this question.  *Compare id.*, *with Osbourne v. Capital City Mortg. Corp.*, 727 A.2d 322, 324–25 (D.C. 1999) ("[A]ppellants' *prima facie* case for breach of contract . . . required some proof of damages.").  The Court sees no reason to weigh in on this potential conflict now.

## IV.

For these reasons, it is hereby

**ORDERED** that Defendant's [6] Motion to Dismiss is GRANTED IN PART and DENIED IN PART; it is further

**ORDERED** that Count I of Plaintiff's [1] Complaint is DISMISSED; and it is further

**ORDERED** that Defendant shall file a responsive pleading to Plaintiff's [1] Complaint on or before May 8, 2020.  *See* Fed. R. Civ. P. 12(a)(4)(A).

**SO ORDERED**.[12]


_____
Dated: April 24, 2020                    TREVOR N. McFADDEN, U.S.D.J.

_____

[12]  The Court has considered Moini's request for a hearing on the President's motion to dismiss, *see* Pl.'s Opp'n at 3, but finds oral argument unnecessary here.  *See* LCvR 78.1.