## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MEHDI MOINI,** | |
| Plaintiff, | |
| v. | Case No. 1:19-cv-03126 (TNM) |
| **MARK S. WRIGHTON**, *in his official capacity as President, George Washington University* | |
| Defendant. | |

## <u>MEMORANDUM OPINION</u>

George Washington University denied tenure to Dr. Mehdi Moini.  Proceeding *pro se*, Moini sued the University's President—a position held by Dr. Thomas LeBlanc at the time and now by Dr. Mark S. Wrighton—alleging that the denial violated multiple laws and his employment contract.  After the Court partially granted the President's motion to dismiss, the parties proceeded to discovery.  That phase is complete, and both parties now move for summary judgment.

The Court finds that the University propounded a legitimate reason for denying tenure: That Moini had not met the requisite standard for teaching.  Moini tries to show that this explanation was pretext for race discrimination.  None of his arguments succeed.  So too for his contractual claims, which are either time-barred or do not show any violation of a contract by the University.

The Court therefore will grant the President's motion and deny Moini's cross-motion.

## I.  BACKGROUND

### A.  The Tenure Application and Review

The University is a private institution in Washington, D.C.  Moini, who identifies himself as a "Middle Eastern (Iranian) man," Compl. ¶ 5, ECF No. 1, began his career there in 2014 as an untenured Associate Professor in the Department of Forensic Sciences (the Department), *see* Def.'s Statement of Mat'l Undisputed Facts (Def.'s SMUF) ¶¶ 8, 9, 11, ECF No. 48.[1]  Although the University did not hire Moini to a tenured position, it said it would reach a tenure decision in three-and-a-half years—by mid-2017.  *See id.* ¶¶ 9, 11.  That timeline was quicker than usual: the University typically makes tenure decisions after seven years.  *See id.* ¶ 9.

When Moini accepted the position, he agreed to all conditions "stated in the Faculty Code and Faculty Handbook."  Def.'s Mot. for Summ. J. (Def.'s MSJ), Ex. 22, ECF No. 48 at 950.  The Code contains the criteria for tenure.  As of 2015, it reserved tenure for faculty "who demonstrate excellence in scholarship, teaching, and engagement in service and who show promise of continued excellence."  Def.'s MSJ, Ex. 6 (Faculty Code) § IV(C)(1), ECF No. 48.[2]  This case centers on the "excellence in teaching" criterion.

Moini began teaching classes in fall 2014, including a mandatory graduate seminar called FORS 6292.  *See* Def.'s SMUF ¶¶ 73, 74.  Moini originally did not teach the class alone.  From Fall 2014 to Spring 2016 he co-taught with Dr. Walter Rowe, *see id.* ¶ 77, a Caucasian tenured professor.

---

[1]  Many of the docket entries are sealed, with all exhibits combined into one large ECF document, complicating citations.  For documents like declarations that have paragraph numbers, the Court cites the paragraph number in-line and provides in footnotes the CM/ECF page numbers where the entire document can be found.  For instance, Defendant's SMUF is available at ECF No. 48, pages 58–124.  For documents without paragraph numbers, the Court provides in-line citations.  All page numbers refer to the pagination generated by the CM/ECF system.

[2]  Available at pages 474–506.

Students would evaluate each class at the end of the semester and rate faculty on a scale of one to five, with five being the best. *Id.* ¶ 80. During Moini's first year, students evaluated him and Rowe together. *Id.* ¶ 77. The average scores in those evaluations fell short of the Department's overall average. *See id.* ¶¶ 85, 89. Moini also co-taught two other classes and received similarly below-average evaluations from students. *See id.* ¶¶ 87, 91.

Those scores did not escape the notice of University officials. The Department Chair, Victor Weedn, told Moini in 2014 that his teaching needed to improve because Moini's scores "[were] not as good as the others." Def.'s MSJ, Ex. 10 (Weedn Dep.), ECF No. 48 at 681. Weedn also referred Moini to the University's Teaching Center. *See* Def.'s MSJ, Ex. 13 (Moini Dep.), ECF No. 48 at 784. And in 2015, Weedn told Moini and Rowe that their seminar had prompted critical comments from students. *See id.* at 803.

Starting in Fall 2015, students could evaluate teachers individually. *See* Def.'s SMUF ¶ 93. Between that time and when he submitted his application for tenure, Moini taught six classes. He received below-average scores in five of them. *See id.* ¶¶ 93, 95, 97, 99, 101, 103. That trend continued after Fall 2016, when Moini began teaching the graduate seminar by himself.

The University had promoted Rowe to Department Chair earlier that year. *See id.* ¶ 22. With that position, Rowe wrote some of Moini's annual report for the 2015–16 school year. *See* Def.'s MSJ, Ex. 18, ECF No. 48 at 902–918. Rowe praised Moini as "a valuable asset to the Department" but admitted that student evaluations of Moini were "a mixed bag." *Id.* at 916. Moini particularly "need[ed] to improve the graduate seminar course." *Id.* Moini himself admitted in that same report that his evaluations "show[ed] mixed results." *Id.* at 907.

In September 2016, Moini applied for tenure and promotion.  *See* Def.'s SMUF ¶ 126.

That submission began a multi-level process of review.  First, the Department's Personnel

Committee—chaired by Rowe—evaluated Moini's materials.  The Committee praised his "very

strong research program" and "strongly positive" evaluations from external reviewers.  *See*

Def.'s MSJ, Ex. 3B, ECF No. 48 at 153.  But the Committee also noted that Moini's student

evaluations were "notably below departmental averages."  *Id.*  "Because of this," the Committee

could not vote for tenure but requested that the Dean extend Moini's tenure clock.  *Id.*  The Dean

denied that request.  *See* Def.'s SMUF ¶ 133.  So the Committee reconvened and "unanimously"

voted to recommend Moini for tenure.  Def.'s MSJ, Ex. 3C, ECF No. 48 at 155.

According to Rowe, who supported Moini's elevation, the Committee felt he was "too

valuable an assert [sic]" to lose.  *Id.*  Rowe then wrote a letter in which he "strongly endorse[d]"

the recommendation of tenure.  Def.'s MSJ, Ex. 3D, ECF No. 48 at 160.  Rowe acknowledged

that Moini's evaluations "ha[d] been below departmental averages," but the Department doubted

that those evaluations "provide[d] a complete picture of [Moini's] interactions with [ ] students."

*Id.* at 159.

Moini's tenure application then followed a lengthy and ultimately fruitless path:

- The Personnel Committee of the Columbian College of Arts and Sciences (CCAS or the College)—which housed the Department—reviewed Moini's application.  *See* Def.'s SMUF ¶ 148.  Based on the low numerical scores and negative comments from students, the committee had "a strong negative impression of [ ] Moini's teaching," which "f[ell] well below" what the committee "would expect from [ ] tenured colleagues."  Def.'s MSJ, Ex. 4G, ECF No. 48 at 368.  So the committee recommended against tenure.

- The College's Dean agreed with the CCAS Committee that Moini's teaching "ha[d] not manifested excellence."  *See* Def.'s MSJ, Ex. 4H, ECF No. 48 at 373.  He recommended against tenure.  *See id.* at 373.

- The University's Provost likewise recommended against tenure.  *See* Pl.'s MSJ, Ex. 50, ECF No. 53-6 at 1140–41.

- Moini's application went to review by the Faculty Senate Executive Committee (FSEC). *See id.* ¶ 163.  The FSEC first found that Moini's application "[did] not provide substantial evidence of excellence in teaching" but then recommended to extend his tenure clock rather than deny tenure.  Def.'s MSJ, Ex. 4I, ECF No. 48 at 388.

- The University President disagreed.[3]  He denied tenure outright, determining that Moini had "failed to meet the standard of excellence in teaching."  Def.'s MSJ, Ex. 4J, ECF No. 48 at 390.

  The President's decision was final, and the University informed Moini of it in June 2017.

*See* Def.'s SMUF ¶ 171.

## B.  The Grievance Process

But that was not the end of the matter.  In August 2017, Moini filed a grievance under the Faculty Code.  *See* Def.'s SMUF ¶ 172.  Under that process, a Hearing Committee determines whether a grievant "has established by clear and convincing evidence" a violation of the Code. *See* Procs. for Impl. of Faculty Code § (E)(4)(c)(7), ECF No. 48 at 503.  Like the tenure application, the grievance process includes multiple levels of review.

After hearing arguments from Moini and the University, a majority of the Hearing Committee affirmed the denial of tenure.  The majority agreed on the excellence of Moini's scholarship and research but determined that the evaluations from the graduate seminar sustained the earlier conclusion that Moini's teaching fell "short of excellent."  Def.'s MSJ, Ex. 30, ECF No. 48 at 1002.  One panel member dissented.  He concluded that the seminar was, by its structure and content restrictions, "unteachable" regardless of professor.  *Id.* at 1004.  He also decried the reliance on student evaluations, which he said were not "a sufficient basis for assessing teaching."  *Id.*

From there, Moini's grievance followed another multi-step but unsuccessful path:

---

[3]  The President then was Dr. Steven Knapp, not the named Defendant here.  *See* Def.'s SMUF ¶ 168.

- Moini first appealed to an Appeals Panel consisting of eight professors from various departments. The Panel unanimously overturned the Hearing Committee's decision, concluding that the Committee and the tenure reviewers had improperly relied "solely on student evaluations of" the graduate seminar, "disregard[ing] every other metric on which teaching should be evaluated[.]" Def.'s MSJ, Ex. 31, ECF No. 48 at 1009.

- The Provost then reviewed the Appeals Panel decision. Contrary to that Panel, he concluded that the various reviewers had considered the entire record, not solely the graduate seminar evaluations. *See* Def.'s MSJ, Ex. 4O, ECF No. 48 at 446. He also noted the Panel's admission that Moini's evaluations were merely "acceptable." *See id.* at 449–50. For these and other reasons, the Provost found compelling reasons not to affirm the Appeals Panel's decision. *See id.* at 454.

- As a final reviewer, a committee of the University Board of Trustees agreed with the Provost. *See* Def.'s SMUF ¶ 236.

After denial of his grievance, Moini left the University sometime in 2018. *See* Decl. of Daniele Podini, ¶ 13, Def.'s MSJ, Ex. 2, ECF No. 48 at 138–39.

## C. This Action

In October 2019, Moini filed this *pro se* Complaint against the President. *See* Compl., ECF No. 1. He alleged that the denial of tenure constituted discrimination in violation of Title VII, a D.C. human rights statute, and 42 U.S.C. 1981. *See id.* He also alleged that the University had violated its contractual obligations during Moini's tenure and grievance processes. *See id.*

The President moved to dismiss the Complaint, and the Court partially granted that motion. *See Moini v. LeBlanc*, 456 F. Supp. 3d 34 (D.D.C. 2020). The Court held that Moini's Title VII and D.C. law claims were time-barred. *See id.* at 45, 46. But the Court denied the motion as to Moini's contractual claims and his claims under § 1981. *See id.* at 50, 51.

After discovery, both parties cross-moved for summary judgment. *See* Def.'s MSJ, ECF No. 48 at 6–57; Pl.'s MSJ, ECF No. 53-1. Those motions are now ripe.[4]

---

[4] The Court has subject matter jurisdiction under 28 U.S.C. § 1331 over Moini's federal claims and supplemental jurisdiction under 28 U.S.C. § 1367 over his contractual claims.

## II.  LEGAL STANDARDS

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When evidence conflicts, courts must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor."  *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006).

The movant bears the initial burden of identifying those portions of the record that show the lack of a genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once completed, the other party must "designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (cleaned up).  Unsupported allegations or mere denials in the pleadings are not enough.  *See* Fed. R. Civ. P. 56(c).  Similarly, because the nonmovant must supply evidence that, if true, would allow a reasonable jury to find in his favor, a "mere . . . scintilla of evidence in support of" the nonmovant's position cannot defeat a motion for summary judgment.  *Anderson*, 477 U.S. at 252.

Moini proceeds *pro se*, so the Court generally subjects his pleadings to "less stringent standards than formal pleadings drafted by lawyers."  *Gray v. Poole*, 275 F.3d 1113, 1115 (D.C. Cir. 2002) (cleaned up).  "Any leeway does not extend," however, "to the *evidence* required at summary judgment[.]"  *Penkoski v. Bowser*, 548 F. Supp. 3d 12, 20 (D.D.C. 2021) (emphasis in original).  Courts hold *pro se* plaintiffs to the same evidentiary burdens as represented plaintiffs.

*See Prunte v. Univ'l Music Grp., Inc.*, 699 F. Supp. 2d 15, 21–22 (D.D.C. 2010), *aff'd*, 425 F. App'x 1 (D.C. Cir. 2011).

### III. RACIAL DISCRIMINATION UNDER SECTION 1981

The Court begins with Moini's discrimination claims under § 1981.  That statute "protects the equal right of 'all persons within the jurisdiction of the United States' to 'make and enforce contracts,'" including contracts for employment, "without respect to race."  *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474–75 (2006) (quoting 42 U.S.C. § 1981(a)).  Section 1981 "can be violated only by purposeful discrimination."  *Gen. Bldg Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391 (1982).

Moini alleges that the University denied him tenure on account of his race.  Moini can show unlawful discrimination with either direct or indirect evidence.  An employee has direct evidence of unlawful discrimination if the employer "overtly refers to the employee's protected trait when making an unfavorable employment decision."  *Deppner v. Spectrum Health Care Res., Inc.*, 325 F. Supp. 3d 176, 187 (D.D.C. 2018) (cleaned up).  For example, "a statement that itself shows racial [ ] bias in the decision" qualifies as direct evidence.  *Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011).  Because direct evidence is "hard to come by," *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1293 (D.C. Cir. 1998) (cleaned up), its presence "generally entitle[s] a plaintiff to a jury trial," *Vatel*, 627 F.3d at 1247.

When a plaintiff must instead rely on indirect evidence of discrimination, the familiar *McDonnell Douglas* burden-shifting framework governs.  *See Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 467 (D.C. Cir. 2017).  That framework has three parts.

First, a plaintiff must establish a prima facie case of racial discrimination.  To prove such a case under § 1981, the plaintiff must show that (1) he is a member of a racial minority; (2) his

employer intended to discriminate against him on the basis of race; and (3) the discrimination concerned an activity enumerated in § 1981. *See Wilson v. DNC Servs. Corp.*, 417 F. Supp. 3d 86, 91 (D.D.C. 2019), *aff'd*, 831 F. App'x 513, 516 (D.C. Cir. 2020).

Next, the burden shifts to the employer to produce a "legitimate, non-discriminatory reason" for its actions. *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008) (Kavanaugh, J.). If the employer produces that evidence, the burden swings back. To survive summary judgment, the employee must show that the employer's explanation was not its true reason and instead was pretextual. *See Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1114 (D.C. Cir. 2016).

That said, once the employer asserts a nondiscriminatory explanation supported by evidence, "the question whether the employee actually made out a prima facie case is no longer relevant." *Brady*, 520 F.3d at 493 (cleaned up). So a court proceeds to the ultimate question: whether the employee has produced enough evidence for a reasonable jury to find that the employer's explanation was not the actual basis for its actions and that discrimination was the real reason. *See id.* "Of course, consideration of this question requires [the court] to evaluate all of the evidence before [it], including the same evidence that a plaintiff would use to establish h[is] prima facie case." *George v. Leavitt*, 407 F.3d 405, 412 (D.C. Cir. 2005); *accord Harris v. Trustees of Uni'v of Dist. of Colum.,* --- F. Supp. 3d ---, 2021 WL 4399552, at *5 (D.D.C. Sept. 25, 2021).

## A.  Direct Evidence

The Court begins with direct evidence. Moini largely does not point to direct evidence—most of his arguments focus on pretext under the *McDonnell Douglas* framework. *See, e.g.*, Pl.'s MSJ at 23, 28 (discussing the "pretextual" nature of multiple parts of the review process). But

he does cite comments that Rowe allegedly made in class.  *See* Pl.'s Reply, ECF No. 63 at 8.

According to Moini, Rowe often denigrated immigrants and foreigners and once said, "we're

going to go and invade California.  It's filled with, you know, people who shouldn't be here."

*See* Moini Dep. at 786.  Moini also describes Rowe as a "xenophobic" person who would react

anytime someone discussed foreigners coming to the United States.  *Id.* at 787.

      To qualify as direct evidence, a statement or remark "must itself show racial [ ] bias in

the [employment] decision."  *Vatel*, 627 F.3d at 1247.  Rowe's alleged statement about

California and Moini's description of him as xenophobic at most show a bias against foreigners,

not against a particular race.  Moini cannot support his *race* discrimination claim with statements

about national origin.  *Accord Ndondji v. InterPark Inc.*, 768 F. Supp. 2d 263, 273 (D.D.C.

2011).  And even if the Court assumes a racial animus behind those statements, they lack "any

temporal or substantive relationship to" the denial of tenure.  *Samuel v. Metro. Police Dep't*, 258

F. Supp. 3d 27, 47 (D.D.C. 2017) (cleaned up).  Moini does not try to argue otherwise.  With no

nexus to the tenure denial, Rowe's statements "are not alone sufficient to withstand a motion for

summary judgment."  *Telesford v. Md. Provo-I Med. Servs., P.C.*, 204 F. Supp. 3d 120, 128

(D.D.C. 2016) (cleaned up).

      More, Moini's arguments about Rowe—whether it be about Rowe's alleged statements or

his conduct elsewhere in the tenure review process—suffer from a "significant initial hurdle."

*Vatel*, 627 F.3d at 1247.  Rowe *supported* Moini's hiring, *see* Def.'s SMUF ¶ 21, and wrote to

the CCAS Committee that he "strongly endorse[d]" Moini's application for tenure, Def.'s MSJ,

Ex. 3D at 160.  After that committee and other reviewers decided to deny tenure, Rowe

interceded before the FSEC.  He urged that body not to put much stock in Moini's teaching

evaluations, attesting to the clarity, concision, and logical progression of Moini's lectures, which

Rowe himself had observed.  *See* Def.'s MSJ, Ex. 3F, ECF No. 48 at 166.  He also explained that Moini's low evaluations resulted from extenuating circumstances, such as a questionable teaching model for some courses, that Rowe felt had "contributed to the low ratings of Professor Moini."  *See id.*  The FSEC agreed with him enough to recommend an extension of Moini's tenure clock rather than an outright denial of tenure.  *See* Def.'s MSJ, Ex. 4I at 388.

"[I]t would be odd" for Rowe to overtly support Moini's tenure application in these many ways while simultaneously trying to deny him tenure because of his race.  *Vatel*, 627 F.3d at 1247.  Indeed, the evidence shows that Rowe supported Moini's tenure application at every turn in the process.  Moini's direct evidence, therefore, falls flat.

## B.  Indirect Evidence

Because there is no direct evidence to permit Moini to reach trial, the Court reviews his indirect evidence.  Moini offers a host of arguments that the University's explanation was pretextual.  The Court takes them in turn and concludes that none of them create a genuine issue of material fact.

### 1.  The University's Explanation

Before those arguments, however, the Court first considers the University's explanation for denying tenure—that Moini "did not demonstrate the required excellence in teaching." Def.'s MSJ at 48.  Recall that many of those who reviewed Moini's application had concerns about his teaching.  The CCAS Personnel Committee said that Moini's teaching—based on his below-average student evaluation scores—"f[ell] well below" the Committee's expectation for "its tenured colleagues."  Def.'s MSJ, Ex. 4G at 368.  The Dean likewise had "serious reservations about [Moini's] teaching."  Def.'s MSJ, Ex. 4H at 372.  And the Provost said Moini "ha[d] not demonstrated excellence.  Pl.'s MSJ, Ex. 50, ECF No. 53-6 at 1140.  Plenty of other

reviewers, including the then-President, echoed those concerns when they concurred with denial of tenure to Moini.

Indeed, Moini consistently scored below Department averages in "Overall Rating of the Instructor" for classes taught before he submitted his tenure application and during consideration of that application.  Often, he was well below the mean:

| Semester | Fall 2014 | Spring 2015 | Fall 2015 | Spring 2016 | Fall 2016 | Spring 2017 |
|---|---|---|---|---|---|---|
| Department Average | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 | 4.2 |
| Moini's Scores | 3.7, 3.7 | 2.7, 3.0 | 3.4, 4.4 | 2.1, 3.0 | 3.6, 3.6 | 2.4, 3.4 |

*See* Def.'s MSJ at 16–18.[5]

The President has thus made "an adequate evidentiary proffer" as to the University's justification.  *Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019) (cleaned up).  He has supported that justification with evidence that the Court "may consider at" summary judgment, including deposition testimony, supporting emails, and University records.  *Id.*  And that evidence supports the justification.  Many individuals reviewed Moini's application in the tenure and grievance process.  Those who supported denial of tenure consistently highlighted his deficiencies as a teacher, a fact supported by the student evaluations.

A jury presented with evidence of such consensus could reasonably find that the University's action "was motivated by" Moini's failure to meet the teaching standard.  *Id.*

---

[5]  This trend continued after formal denial of Moini's tenure application.  Over his final four semesters, the Department's teachers again averaged a score of 4.2 each semester.  But Moini scored 3.2, 3.9, 2.2, and 3.1.  *See* Def.'s MSJ at 19.

(cleaned up).  Not only is that a nondiscriminatory reason, it is "facially credible in light of the proffered evidence."  *Id.* at 1088 (cleaned up).

### 2.  The University's Explanation Was Not Pretextual

The Court turns then to the "central issue":  Whether Moini has "produced evidence sufficient for a reasonable jury to find that the [University's] stated reason was not the actual reason and that the [University] intentionally discriminated against" Moini "based on his race." *Brady*, 520 F.3d at 495.  To support his claim, Moini mainly argues that the University failed to follow its own procedures and gave favorable treatment to other professors and tenure candidates.  He also makes other, less developed, arguments.

None of his arguments support an inference of pretext.

### a.  Moini's Prime Facie Case

For starters, Moini's prima facie case suffers from a serious flaw.  Recall that he must be "a member of a racial minority" to have a § 1981 claim.  *Wilson*, 417 F. Supp. 3d at 91.  To make that showing, Moini must identify "ethnic characteristics" specific to that racial minority. *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987).

Throughout this case, Moini has said that he is Middle Eastern.  *See* Pl.'s MSJ at 4, Moini Dep. at 821.  But Moini provides little to no evidence about whether he has the kind of characteristics common to Middle Easterners.  When asked to identify those attributes at his deposition, Moini said Middle Easterners "eat flat bread," "are sensitive," and "joke."  Moini Dep. at 821.  That is all.  He then suggested that defense counsel "[g]o talk to a psychologist" or "a sociologist" about those characteristics.  *Id.*  And Moini denoted his ethnicity as "White" in a 2019 EEOC complaint.  *See* Def.'s MSJ, Ex. 35, ECF No. 48 at 1051.  So Moini not only fails to

discuss what makes him Middle Eastern, he also has previously declined to identify that as his race.  This is not enough.

To be clear, the Court does not determine now whether Moini has stated a prima facie case.  *See Brady*, 520 F.3d at 494.  But to deny summary judgment to the President, the Court must conclude that a jury could "infer . . . discrimination from all the evidence," including the "prima facie case."  *Nurriddin v. Bolden*, 818 F.3d 751, 758–59 (D.C. Cir. 2016).  Here, that evidence shows no attempt by Moini to define his race beyond some off-the-cuff comments about characteristics shared by people of many races.  A jury considering "the total circumstances of the case" would confront the same evidence.  *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (cleaned up).  The Court then must also consider it.

### b. Alleged Failure to Follow Established Procedures

Moini devotes much of his briefs to argue that various parts of the reviewing process failed to follow the University's "established procedures" for tenure.  *Brady*, 520 F.3d at 495 & n.3.  To be sure, an employer's failure to follow established procedures can give rise to pretext, but that failure "alone, may not be sufficient to support the conclusion that [the employer's] explanation for the challenged action is pretextual."  *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (cleaned up).  More, neither the Court nor a jury is a "super-personnel department" able to reevaluate the merits of a personnel decision.  *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (cleaned up).  Because of that limited review, the Court "may not second-guess an employer's personnel decision absent demonstrably

discriminatory motive." *Hairston v. Vance-Cooks*, 773 F.3d 266, 272 (D.C. Cir. 2014) (cleaned up).

Moini presents insufficient evidence to show that the University had certain "established procedures" for tenure.  The Court discusses separately the procedures from before his tenure application and those from during review of that application.

### i.   Pre-Application Procedures

Moini argues that the University should have provided him a mid-tenure review.  *See* Pl.'s MSJ at 9–10.  But none of the cited policies *required* such a review.  The Department's Constitution directed a committee "to evaluate annually tenure-track faculty and inform them of their progress toward tenure."  Def.'s MSJ, Ex. 3A, ECF No. 48 at 151.  The key word there is "annually."  Moini received those annual reports.  *See* Def.'s MSJ, Exs. 17–19.  As for the College's 2013 Bylaws, they allowed departments to "establish their own procedures" for evaluating the progress of candidates for tenure.  Def.'s MSJ, Ex. 4A, ECF No. 48 at 194.

Some policies apparently did require a mid-tenure review, at least for some candidates. The June 2015 update to the Faculty Code required each school and department to "establish and publish written procedures to provide reviews to guide faculty members concerning progress toward tenure."  Faculty Code § IV(C)(3).  The College responded later that year with procedures for reviews of every candidate "at the approximate mid-point of the period leading to their tenure review[.]"  Pl.'s MSJ, Ex. 64, ECF No. 53-6 at 1185.

Moini pounces on the University's admission that "a mid-tenure review of [Moini] was not done[.]"  Resp. to Pl.'s Rev'd First Req. for Adm'n, Pl.'s MSJ, Ex. 43, ECF No. 53-6 at 741. Unrebutted evidence shows, however, that relevant policies did not require a mid-tenure review for him.  Before the College released the guidelines, a professor clarified that "since [Moini was]

on a fast track," he "[would] not have an official" mid-tenure review.  Pl.'s MSJ, Ex. 69, ECF
No. 53-6 at 1201.  An email from Weedn in April 2016 reiterated the same policy.  *See* Pl.'s
MSJ, Ex. 68, ECF No. 53-6 at 1199 ("3 year fast tracks usually do not have a mid-tenure
review.").  Moini provides no evidence of any other policy for fast-track tenure applicants for
mid-tenure reviews.[6]

Beyond Moini's arguments about formal mid-tenure reviews, he also says more generally
that nobody from the University produced comments "about [his] teaching that [ ] discussed his
progress toward tenure."  Pl.'s MSJ at 18.  The evidence says otherwise.  One annual review
identified issues with his teaching.  *See* Def.'s MSJ, Ex. 18 at 916 ("Students' evaluations of
Moini's teaching are a mixed bag.").  And recall that Weedn informed Moini more than once of
negative student comments about his teaching.  *See* Weedn Dep. at 681.  Moini himself knew
about those negative evaluations and admitted reading them.  *See* Def.'s MSJ, Ex. 18 at 907
("My teaching evaluations show mixed results.").

Finally, despite the policy against a formal mid-tenure review, Weedn testified that he
gave Moini an "informal" one.  *See* Decl. of Victor Weedn ¶ 9, Pl.'s MSJ, Ex. 65, ECF No. 53-6
at 1191.  During that conversation, Weedn discussed Moini's "teaching, publications, and
grants."  *Id.*  So the evidence rebuts Moini's assertion that no one discussed with him the
relationship between his teaching and his progress towards tenure.

---

[6]  And even if the 2015 College procedures required mid-tenure reviews for fast-track applicants,
the email evidence shows a norm under which the College did not give such reviews to fast-track
applicants.  That the College followed that norm does not support pretext even if it technically
violated the procedures.  *See Fischbach*, 86 F.3d at 1183.

In sum, the totality of the evidence shows that the University violated no policies when it failed to conduct a mid-tenure review of Moini.  The policies either did not require one at all or did not apply to a professor like Moini on a fast track to tenure.

### ii.  Procedures During Review of Application

Next, consider Moini's arguments about the review of his tenure application.  Some background is required.  In mid-2016—before Moini submitted his tenure application—the Provost instituted guidelines on what each application should include.  *See* Def.'s Reply, Ex. 37A, ECF No. 58 at 48–55.  Under "Teaching Effectiveness," those Provost Guidelines listed internal peer reviews and student feedback.  *Id.* at 54.  For the former, the Provost "encouraged" departments to provide reviews from a peer who had observed the candidate's teaching.  *Id.*  For the latter, the Provost listed "both scores and comments, provided by the department."  *Id.*  In a footnote, the Provost said anyone seeking more details should reference other guidelines from the University's Teaching and Learning Center.  *See id.* at 53.

Issued in 2013, those guidelines (TLC Guidelines) differed slightly from the Provost's.  *See* Def.'s Reply, Ex. 37B, ECF No. 58 at 57–60.  *First*, they explicitly required internal peer reviews.  *See id.* at 58 ("(Required) Internal Peer Reviews.").  *Second*, they directed departments, when compiling student feedback, to "includ[e] comparisons with similar courses (and with similar enrollments) taught by others."  *Id.  Third*, they recommended student letters, including ones supplied by the candidate and others sought "by [the] department/school."  *Id.*

Moini relies heavily on the TLC Guidelines.  Based on those provisions, he faults the University for (1) not providing an internal peer review, (2) not comparing his student evaluations with those of Rowe, (3) not providing an external peer review, and (4) removing from his application student letters supplied by him.  *See* Pl.'s MSJ at 21–22.

These arguments founder on unrebutted testimony from the Provost and Rowe. The Provost testified that the Teaching and Learning Center "had authority to recommend components for tenure dossiers, but no authority to mandate items to be included." Supp. Decl. of Forrest Maltzman ¶ 8, Def.'s Reply, Ex. 37 (Maltzman Supp. Decl.), ECF No. 58.[7] Rowe likewise testified that the TLC Guidelines were "non-binding" and that "administrators had discretion to determine how best to move a tenure and promotion dossier forward." Supp. Decl. of Walter Rowe ¶ 5, Def.'s Reply, Ex. 38, ECF No. 58.[8] Moini never suggests otherwise, either on the mandatory nature of the TLC Guidelines or whether the College followed them as a general practice.

So too for the Provost Guidelines. The Provost himself testified that he never intended to bind the University to every part of those guidelines. *See* Maltzman Supp. Decl. ¶ 5. More important, he testified that the University itself did not strictly follow them. He explained that the University had "approved tenure in cases where the application dossier did not comply with many requirements in the Guidelines." *Id.* Moini again does not refute that statement, forcing a reasonable factfinder to conclude that the Provost Guidelines were not "established policies and procedures."

This brings us to the University's use of student evaluations. Moini says that the school "solely relied on student evaluations" from his graduate seminar and refused to rely on any other objective metrics used to measure teaching excellence. Pl.'s MSJ at 7.

The Court cannot agree with this factual characterization. Every reviewer to deny tenure cited Moini's below-average student evaluations, which covered classes beyond the graduate

---

[7] Available at pages 40–46.

[8] Available at pages 69–70.

seminar.  Remember, he taught more than just that one course.  To be sure, the reviewers

excerpted comments from the reviews of that course.  But nothing suggests that reviewers

dismissed evaluations from other courses (which were also mostly below Department averages,

*see* Def.'s MSJ at 16–19).  So the Court finds little support for Moini's contention that reviewers

relied "solely" on evaluations from that one course.

As to possible pretext, Moini provides no established policy or procedure prohibiting the

University from relying on student evaluations.[9]  The College Bylaws that Moini cites for other

arguments say that judgments about academic excellence "cannot be reduced to a quantitative

formula."  Def.'s SMUF ¶ 32.  Although an imperfect tool, student evaluations are a key part of

that judgment.  Teaching is about instruction of students.  A student's complaints about a

teacher's instruction therefore go directly to the heart of teaching excellence.

No reasonable jury could fault the University for relying on them to analyze teaching

excellence.  And in any event, a jury is not a "super-personnel department" that can revisit that

decision, *Barbour*, 181 F.3d at 1346 (cleaned up), "absent demonstrably discriminatory motive,"

*Hairston*, 773 F.3d at 272 (cleaned up).  Courts are especially wary of second-guessing

personnel decisions in the academic context.  *See Harris*, 2021 WL 439952, at *10.  The mere

use of teaching evaluations to judge teaching excellence does not point to an illicit motive,

particularly when Moini's scores were consistently below average, a fact noticed and cited by

---

[9]  At one point, Moini cites a University document where the FSEC Chair asked for information
beyond student evaluations to evaluate teaching.  *See* Pl.'s MSJ, Ex. 72, ECF No. 53-6 at 1208.
Moini portrays this document as University or College policy, but it lists only
"[r]ecommendations" and its author testified that he was "merely suggesti[ng]" what types of
information could be helpful.  Dep. of Paul Duff, Def.'s MSJ, Ex. 11, ECF No. 48 at 708.  That
is hardly an "established" policy.

almost every reviewer.[10]  *Cf. id.* at \*11 (rejecting retaliation claim brought by professor regarding dean's low evaluations where dean consistently ranked subordinates harshly).

Moini identifies one anomaly that requires explanation.  Although he submitted letters from former students with his application, the Department asked him to remove those letters. *See* Def.'s SMUF ¶ 145.  The Department instead asked former students to submit their letters directly without going through Moini.  *See id.*  When two such letters came in, Rowe decided not to submit them.  *See* Dep. of Walter Rowe, Def.'s MSJ, Ex. 9 (Rowe Dep.), ECF No. 48 at 640. For Moini, this oversight shows an intentional effort by the Department to withhold "any teaching related evidence that could have helped Moini to showcase his teaching."  Pl.'s MSJ at 23.

Recall again that Moini has pointed to no established policies or procedures on the University's use of letters from former students.  Even if he had, however, the evidence shows no discriminatory motive.  The removal of student letters was so that the University could see "independent and candid" reviews from Moini's former students, not ones that he had pre-screened.  Def.'s SMUF ¶ 145.  Rowe also testified that submitting only two letters "would highlight the problems with [Moini's] teaching."  Rowe Dep. at 640.  Given Moini's decades of

---

[10] Relying again on the TLC guidelines, Moini argues that the reviewers should have compared his student evaluations with Rowe's for the graduate seminar.  *See* Pl.'s MSJ at 21.  He thinks that had the reviewers done so, they would have seen that Moini got the same scores as Rowe and then would have dismissed Moini's negative evaluations as a symptom of the course structure, not his teaching.  The actual evaluations do not support his assertions.  True, Rowe received ratings of 2.9 in two semesters when he taught the graduate seminar by himself.  *See* Pl.'s MSJ, Ex. 95, ECF No. 53-6 at 1352; *id.* Ex. 96, ECF No. 53-6 at 1355.  Those scores mirror what Moini received in the same class.  But once students could evaluate teachers separately, Rowe received a noticeably higher score than Moini.  In the graduate seminar, Moini received a 2.1 rating, compared to Rowe's 3.4, in Spring 2016.  *See* Def.'s SMUF ¶ 203.  And in a different class co-taught that semester by the pair, Moini got a 3.0 rating and Rowe got a 4.7.  *See id.* From this and Moini's below-average scores in almost every other course, the University could reasonably conclude that Rowe was a better teacher than Moini.

experience as an educator, Rowe was likely correct that so few letters might cast a negative light on Moini rather than a positive one.  And as discussed, these claims of pretext ignore Rowe's ultimate and unflagging support of Moini's application for tenure.

Finally, Moini points out that one of the reviewers on the CCAS Committee "had an incident of racism" and did not recuse herself from review of his tenure application.  Pl.'s MSJ at 26.  That allegedly racist incident, however, occurred in 2018, one year *after* the CCAS Committee voted to deny Moini tenure.  *See generally* Pl.'s Reply, Ex. S1, ECF No. 63-2 at 5–6. So even under Moini's version of the University's procedures, the reviewer need not have recused herself based on an incident that had yet to happen.[11]  And because the incident happened after the decision to deny tenure to Moini, it has no obvious connection to that decision.

### c.  Alleged Comparators

Now for Moini's alleged comparators.  "Evidence of an employer's more favorable treatment to similarly situated employees without the plaintiff's protected characteristic may indicate discriminatory animus."  *Breiterman v. U.S. Capitol Police*, 15 F.4th 1166, 1174 (D.C. Cir. 2021).  But for another employee to be similarly situated, a plaintiff must show "that all of the relevant aspects of his employment situation were nearly identical to those of the other

---

[11]  True, the presence of this reviewer on the Committee could support Moini's assertions of pretext.  But several independent levels of review occurred after the CCAS Committee.  All of them cited Moini's teaching inadequacies as the reason to deny tenure.  And there is no evidence that this allegedly biased reviewer had any contact with later reviewers.  Given the lack of contact and that later reviewers agreed with the CCAS Committee about Moini's teaching, the evidence of one potentially biased early reviewer does not render the University's explanation pretextual.  *Accord Parker v. Nat'l R.R. Passenger Corp.*, 214 F. Supp. 3d 19, 27 (D.D.C. 2016) (granting summary judgment when, despite contact between biased supervisor and higher-level reviewer, the later review did not depend on the supervisor's statements).

employee." *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) (cleaned up).

Moini points to Rowe's promotion to Department Chair.[12]  According to Moini, Rowe got a promotion even though he "received similarly poor student evaluations" in the graduate seminar.  Compl. ¶ 57.  That disparate treatment shows, he says, discriminatory animus.

But the promotion criteria for the two positions were very different.  A professor seeking tenure must show teaching excellence.  The criteria for a Department Chair include no similar standard.  *See* Def.'s SMUF ¶ 23.  In fact, the position of tenured professor and Department Chair have little relationship at all.  One could even become Chair without being tenured.  *See* Weedn Dep. at 660 (noting that Rowe had once been Department Chair despite not having tenure).  Rowe and Moini thus were subject to different performance standards, making the "relevant aspects" of their employment situations not nearly identical.  *Burley*, 801 F.3d at 301; *see Coats v. DeVos*, 232 F. Supp. 3d 81, 95 (D.D.C. 2017) (rejecting potential comparator because he was subject to lower performance standards than the plaintiff).

For the same reason, one of Moini's other comparators is inadequate.  Moini points to Dr. Andrew Smith, a non-Middle Eastern faculty member who, despite poor student evaluations, received tenure in 2014.  *See* Pl.'s MSJ at 45–47.  The year is all that matters.  Before 2015, the University required merely "professional competence" in teaching for a candidate to receive tenure.  *See* Def.'s MSJ, Ex. 4C § IV(C)(1), ECF No. 48 at 241.  So Smith's elevation to tenure occurred under a different standard than the one applicable to Moini two years later.  Smith is therefore not an appropriate comparator either.

---

[12]  Indeed, Moini claims that the University "rewarded" Rowe with the promotion for his efforts in discriminating against Moini.  *See* Pl.'s MSJ at 23.

Closer to the mark is Dr. Antwan Jones, Moini's other proposed comparator.[13] *See* Pl.'s MSJ at 43–45. Jones received tenure in 2016 despite below-average student evaluations. Based on the evidence, Jones had an average score of 3.43, lower than the Department-wide average of 4.16.[14] In contrast, Moini had a pre-application average score of 3.21. *See* Def.'s MSJ at 16–17.

Despite these somewhat similar scores, the evidence confirms that Jones is not a valid comparator to Moini. For one thing, Jones taught in a different department than Moini. *See* Def.'s Reply, Ex. 37C, ECF No. 58 at 62. Jones therefore had a different set of supervisors review his tenure application at the departmental level. *See Rassa v. Amtrak*, 850 F. App'x 1, 3 (D.C. Cir. 2021) (finding another employee not similarly situated to the plaintiff in part because the two "worked under different supervisors"); *Gulley v. District of Columbia*, 474 F. Supp. 3d 154, 167 (D.D.C. 2020) (same). More, although Jones's student evaluations mirror Moini's, he taught more courses and more students than Moini did. The two thus had "different roles," rendering them inapt comparators. *Burley*, 801 F.3d at 301.

Finally, reviewers of Jones's application noted that his evaluations showed an "upward trajectory" in his teaching. Def.'s MSJ, Ex. 37C at 63; *see also* Pl.'s MSJ, Ex. 86, ECF No. 53-6 at 1251. Indeed, the numbers provided by Moini show the same trend. Jones averaged a 3.3 rating over his first eight evaluations, and a 3.55 rating over his second eight evaluations. *See* Pl.'s MSJ at 44–45. In contrast, Moini's scores were relatively flat. Over the eight evaluations preceding his tenure application, Moini received a 3.275 average rating for the first four and a

---

[13]  Moini first mentions Smith and Jones in his motion for summary judgment, which is likely impermissible. *Accord Mosleh v. Howard Univ.*, No. 19-cv-0339 (CJN), 2022 WL 898860, at *7 (D.D.C. Mar. 28, 2022). But the Court analyzes the new comparators anyway.

[14]  For Jones's average scores, the Court uses the numbers provided in Moini's brief, *see* Pl.'s MSJ at 44–45, even though the record corroborates only some of them. One of Moini's exhibits includes some of Jones's scores, but not all of them. *See* Pl.'s MSJ, Ex. 84, ECF No. 53-6 at 1237–1246.

3.225 for the second four.  *See* Def.'s MSJ at 16–17.  And after receiving two ratings of 3.7 in

his initial two classes, Moini received one rating above that score before applying for tenure.  *See*

Def.'s MSJ at 17 (showing a 4.4 rating for one class in Fall 2015).  As other courts have held,

those signs of improvement are a relevant distinction between comparators.  *See Coats*, 232 F.

Supp. 3d at 95; *Anakor v. Archuleta*, 79 F. Supp. 3d 257, 263–64 (D.D.C. 2015), *aff'd*, 2015 WL

5210455 (D.C. Cir. Sept. 3, 2015).

Thus, none of Moini's proffered comparators present employment situations that were

"nearly identical" to his.  *Burley*, 801 F.3d at 301.  He therefore fails to show pretext based on

those comparators.

### d.  Other Arguments on Pretext

Now consider Moini's grab bag of other arguments.  Moini first recites several

demographic statistics about the faculty and students in the Department.  *See* Pl.'s MSJ at 11

("[F]ull-time faculty in the Department currently consists of all Caucasian men."); Pl.'s Reply at

6, ECF No. 63 ("[E]xcept for a strong Jewish minority, the percentages of other minorities were

significantly below the national averages.").  "[W]ithout more," this kind of demographic

information "does not support an inference of discrimination."  *Bolden v. Clinton*, 847 F. Supp.

2d 28, 35 (D.D.C. 2012).

So too for the University's alleged admission of a racist climate on campus.  In 2018, the

President sent a campus-wide email "about the need to try to improve race relations on campus."

Def.'s SMUF ¶ 271.  The email referred to concerns by minority students and faculty about the

University community's lack of inclusivity.  *See id.*  Put simply, an email sent after the tenure

denial about general racism has little to do with Moini's tenure application.  "[I]t is inappropriate

to rely on extrapolation from general evidence of discriminatory episodes when there is available

specific evidence directly relevant to the particular plaintiff." *Williams v. Boorstin*, 663 F.2d 109, 115 n.38 (D.C. Cir. 1980).

Lastly, Moini says that he received "three merit raises." Pl.'s MSJ at 23. Such indicia of positive performance might support an inference of pretext. *See, e.g., George*, 407 F.3d at 414 (finding employer's justification to be pretextual in part because employer gave positive performance reviews to the plaintiff). But Moini gives no evidence about these raises, including their size or timing. He bears the burden to make that evidentiary showing. *See Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 151 (D.C. Cir. 1996). The Court is not required "to sift through hundreds of pages of" the record "to make [its] own analysis and determination of what may, or may not, be a genuine issue of material disputed fact." *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir. 1988).

\* \* \*

In sum, Moini has not shown evidence to support an inference of pretext or discrimination by the University. Beyond the flaw in his prima facie case, his proffered comparators were not similarly situated to him. And despite his consistent entreaties, Moini nowhere suggests a policy or procedure that the University violated during the tenure application process. He thus fails to create an inference that the University's reason for denying tenure was pretextual. The Court will grant summary judgment to the President on Count III.

## IV.  CONTRACTUAL CLAIMS

Next up are Moini's breach of contract claims. He largely repackages his discrimination claim, arguing that the University violated various contractual obligations before he applied for tenure, during review of his application, and during the grievance process.

Breach of contract under D.C. law requires (1) a valid contract; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach. *See Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009). The statute of limitations for these claims is three years. *See* D.C. Code § 12-301(7). When contract claims arise in the academic context, however, the Court "generally give[s] deference to the discretion exercised by university officials." *Allworth v. Howard Univ.*, 890 A.2d 194, 202 (D.C. 2006).

### A.  Claims Related to Pre-Application Period

The Court starts with Moini's pre-application claims, which are barred by the statute of limitations. Much like his discrimination claims, Moini argues that the University breached its contract by not giving him a mid-tenure review and not informing him of his teaching deficiencies. *See* Pl.'s MSJ at 36 (referencing discussion of these facts in section on discrimination claims). For statute-of-limitations purposes, those claims accrue when Moini's review was due and not provided, not when the University formally denied tenure. *See Wright v. Howard Univ.*, 60 A.3d 749, 752–53 (D.C. 2013).

Recall that the mid-tenure guidelines suggested mid-tenure review "at the approximate mid-point of the period leading to [ ] tenure review[.]"[15]  Pl.'s MSJ, Ex. 64 at 1185. Moini started on January 1, 2014, with a three-and-a-half-year tenure clock. Thus, the midpoint of his period would be in early October 2015. That date is easily more than three years before Moini sued in October 2019. So any claim about a mid-tenure review is time-barred, assuming that review should have occurred, as the policy says, at the midpoint.

In any event, all pre-application claims are time-barred. Moini argues in essence that the lack of pre-application feedback prevented him from correcting deficiencies in his teaching

---

[15] The Court assumes for now that those guidelines are contractually binding on the parties.

performance and taking timely steps to meet the tenure criteria.  *See Wright*, 60 A.3d at 752–53; *see also* Compl. ¶ 75 (asserting that University policies "recommend" pre-application feedback "with sufficient time for the Prof[essor] to make adjustments or corrections to address those concerns before a decision is made in the formal tenure review process").

That feedback, however, became irrelevant once he applied.  So his pre-application claims, regardless of exact midpoints or other timetables, accrued at the latest when he applied for tenure.  *See Mawakana v. Bd. of Trustees of the Univ. of the Dist. of Colum.*, 926 F.3d 859, 869 (D.C. Cir. 2019) (holding that claims about university's obligations during a particular academic year accrued on the final day of that academic year).  He did so in September 2016—more than three years before suing.  So no matter when exactly any pre-application claims accrued, they all fall outside the three-year limitations period, and are thus time-barred under D.C. law.

## B.  Claims Related to Review of Application

Next, consider Moini's claims about the review of his application.  He says the Provost "both during the tenure denial and grievance process" should have considered various extenuating circumstances, like the relative newness of the graduate seminar and the consistency between Moini's and Rowe's evaluations.  Pl.'s MSJ at 40.  But Moini suggests no *contractual* breach there.  He points to no University policy requiring consideration of factors beyond the Faculty Code's criteria of "excellence in scholarship, teaching, and engagement in service." Faculty Code § IV(C)(1).

Moini's Complaint points to the various guidelines on tenure applications.  *See* Compl. ¶ 77.  Recall that both the TLC Guidelines and the Provost Guidelines discuss comparing an applicant's student evaluations with other courses and professors.  Moini suggests that the

Provost should have considered the consistency between Moini's and Rowe's evaluations. *See* Pl.'s MSJ at 40.

But no evidence shows that those guidelines are contractually binding on the parties. By his signature on the appointment letter, Moini agreed as part of his contract to the Faculty Code and the Faculty Handbook "and any subsequent changes or amendments" to them. *See* Def.'s MSJ, Ex. 22 at 950. Recall that the evidence shows that the University never intended those tenure guidelines to be part of the Faculty Code or the Faculty Handbook.[16] *See* Maltzman Supp. Decl. ¶¶ 5, 8. Moini's complaints in this area thus reduce to an attempt to re-do the tenure and grievance process. That effort does not belong here: Neither the Court nor a jury acts as a "super-personnel department." *Barbour*, 181 F.3d at 1346 (cleaned up).

So too for Moini's contention that the Provost did not follow the University's definition of "compelling reason." *See* Pl.'s MSJ at 37; Compl. ¶ 78. The Faculty Code lists as compelling reasons "[f]ailure to conform to tenured published tenure or promotion policies." Faculty Code § IV(E)(1)(ii). Moini's own inability to, in the judgment of the Provost, show excellence in teaching was a failure to meet published tenure criteria. The Provost said as much during his tenure review, *see* Pl.'s MSJ, Ex. 50, and his grievance review, *see* Def.'s MSJ, Ex. 4O. Moini's suggestions to the contrary simply ignore the Provost's written opinions on the subject.

Moini includes in his brief two other contractual claims, both involving the Department's request to extend his tenure clock. *See* Pl.'s MSJ at 36–37. Neither of these claims appeared in

---

[16] Moini says otherwise. He asserts that the Code prohibits "[f]ailure to conform to published tenure or promotion policies, procedures, and guidelines." Pl.'s MSJ at 35. That clause does appear in the Code. But not as a proscription against the University. It is instead a basis on which higher-level tenure reviewers may "independently concur or nonconcur" with a tenure recommendation. Faculty Code § IV(E)(1). So Moini misstates the Code's requirements as to tenure policies.

Moini's Complaint.  The Court rejects them on that basis as untimely.  *See Wilson*, 417 F. Supp. 3d at 97.

### C.  Claims Related to Grievance Process

Moini makes two contractual claims related to the grievance process.

*First*, he alleges that the Vice Provost had an improper *ex parte* communication with the Hearing Committee.  *See* Pl.'s MSJ at 41.  This allegation implicates the Faculty Code, which requires parties to "avoid ex parte communications bearing on the substance of the dispute."  Procs. for Impl. of the Faculty Code § (E)(b)(7).  The relevant facts are these:  Moini first met with the Committee by himself—*ex parte*.  *See* Def.'s SMUF ¶ 180.  The Committee later realized that they should have held "a single hearing," with both sides present.  Pl.'s MSJ, Ex. 83, ECF No. 53-6 at 1236.  To facilitate that hearing, the Committee emailed the recording of its Moini-only proceeding to the Vice Provost.  *See* Pl.'s MSJ, Ex. 90, ECF No. 53-6 at 1330.

The parties' factual recitations diverge here.  Moini says that the Vice Provost responded to that email on the same day, allegedly engaging in secret communications.  *See* Pl.'s MSJ at 42.  The evidence contains no such emails.  The only emails between the Vice Provost and the Committee occurred two months later, when the Vice Provost discussed confidentiality of Moini's tenure reviewers.  *See* Def.'s MSJ, Ex. 4N, ECF No. 48 at 438.  The emails discuss Moini's grievance process, but nowhere does the Vice Provost advocate for the Committee to find in the University's favor.  He is concerned only with the privacy interests of reviewers who submitted materials for Moini's tenure application.  *See id.*  Such conversations are not about the "*substance* of the dispute," and therefore do not violate the Faculty Code.  Procs. for Impl. of the Faculty Code § (E)(b)(7) (emphasis added).

*Second*, Moini says the University denied him the right to "inspect and copy" before his grievance hearing "all relevant documents in the control of the other party and not privileged." Procs. for Impl. of the Faculty Code § 4(c)(3).  He says that the University should have provided him with all of Rowe's student evaluations.  *See* Pl.'s MSJ at 43.

Moini has a point, but the evidence shows that he either abandoned his contractual right or did not pursue it properly.  He asked the Hearing Committee Chair to "ask the administration" to provide all of Rowe's past student evaluations.  Def.'s MSJ, Ex. 29, ECF No. 48 at 998.  The Chair advised him that such new information might not add much to Moini's case.  *See id.* Nowhere did the Chair imply or suggest that Moini could not request or see those evaluations. He suggested only that Moini might not need them.  Moini agreed, deciding (incorrectly) from this response that "the committee had already decided in [his] favor."  Moini Dep. at 814.  So he "really d[id]n't need, therefore[,] more information."  *Id.*

Based on this evidence—and Moini suggests no other evidence—Moini relinquished the right to inspect and copy all relevant documents.  Part of the problem is that he made his request of the Hearing Committee, not of the University, who was "the other party" in the proceeding. *See* Procs. for Impl. of the Faculty Code § 4(c)(3); *see also id.* § 4(a)(2) ("[A] grievance may only be maintained against *the university* for official acts.") (emphasis added).  The University therefore never blocked his access.

In sum, Moini has not created a factual issue as to the University's contractual obligations.  Some of his claims are barred by the statute of limitations and others rely on noncontractual documents.  Still others show that the University did not violate its contractual obligations.  Based on this evidence, the Court holds that no reasonable jury could find that the University acted arbitrarily and capriciously, breached a contract, or violated the implied

contractual covenant of good faith and fair dealing.  The Court will therefore grant summary

judgment to the President on Counts II, III, and IV.

## V.  CONCLUSION

Moini may be right that the University put inordinate weight on student evaluations.  And

perhaps the classes he taught were particularly susceptible to harsh evaluations.  But the

University, like all employers, has wide latitude in how it evaluates and promotes its employees.

Moini has failed to undermine the University's evidence that it did not act discriminatorily in its

tenure decision, and that is what matters here.  The Court will grant the President's motion for

summary judgment and will deny Moini's cross-motion.  A separate Order will issue.



Dated: May 13, 2022                                        TREVOR N. McFADDEN, U.S.D.J.